# MONSANTO CO. *v.* SPRAY-RITE SERVICE CORP.

No. 82–914.   Argued December 5, 1983—Decided March 20, 1984

POWELL, J., delivered the opinion of the Court, in which all other Members joined, except WHITE, J., who took no part in the consideration or decision of the case. BRENNAN, J., filed a concurring opinion, *post*, p. 769.

*Fred H. Bartlit, Jr.,* argued the cause for petitioner. With him on the briefs were *Jeffrey J. Kennedy, Marjorie Press Lindblom, Robert J. Kopecky, Michael T. Hannafan,* and *Richard W. Duesenberg.*

*Assistant Attorney General Baxter* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Lipsky, Jerrold J. Ganzfried, Robert B. Nicholson,* and *Edward T. Hand.*

*Edward L. Foote* argued the cause for respondent. With him on the briefs were *Earl A. Jinkinson, Robert G. Foster,* and *David B. Love.**

---

*Briefs of *amici curiae* urging reversal were filed for Associates for Antitrust Analysis by *Wesley J. Liebeler;* for the National Agricultural Chemicals Association by *Donald F. Turner, Arnold M. Lerman, James S. Campbell,* and *Ronald J. Greene;* and for the National Association of Manufacturers by *Donald I. Baker, Robert H. Rawson, Jr., Thomas E. Kauper, William E. Blasier,* and *Quentin Riegel.*

Briefs of *amici curiae* urging affirmance were filed for Burlington Coat Factory Warehouse Corp. by *Herbert S. Kassner;* for the National Mass Retailing Institute by *Endicott Peabody, Timothy J. Waters,* and *William D. Coston;* for the National Association of Catalog Showroom Merchandisers by *Richard B. Kelly;* for Service Merchandise Co., Inc., by *William A. Carey, John F. Sherlock III,* and *Donald F. Mintmire;* and for Forty-Six States by *Ken Eikenberry,* Attorney General of Washington, *John R. Ellis,* Deputy Attorney General, *Jon P. Ferguson* and *James Kirkham Johns,* Assistant Attorneys General, *Charles A. Graddick,* Attorney General of Alabama, *Susan Beth Farmer,* Assistant Attorney General, *Norman C. Gorsuch,* Attorney General of Alaska, *Louise E. Ma,* Assistant Attorney General, *Robert K. Corbin,* Attorney General of Arizona, *Alison B. Swan,* Assistant Attorney General, *John Steven Clark,* Attorney General of Arkansas, *David L. Williams,* Deputy Attorney General, *Jeffrey A. Bell,* Assistant Attorney General, *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, *Sanford N. Gruskin,* Assistant Attorney General, *Wayne M. Liao,* Deputy Attorney General, *Duane Woodard,* Attorney General of Colorado, *Thomas P. McMahon,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Robert M. Langer,* Assistant Attorney General, *Charles M. Oberly,* Attorney General of Delaware, *Vincent M. Amberly,* Deputy Attorney General, *Jim Smith,* Attorney General of Florida, *Bill L. Bryant, Jr.,* Assistant Attorney General, *Tany S. Hong,* Attorney General of Hawaii, *Sonia Faust,* Deputy Attorney General, *Neil F. Hartigan,* Attorney General of Illinois, *Thomas M. Genovese,* Assistant Attorney General, *Linley E. Pearson,* Attorney General of Indiana, *Frank A. Baldwin,* Deputy Attorney General, *Thomas J. Miller,* Attorney General of Iowa, *John R. Perkins,* Assistant Attorney General, *Robert T. Stephan,* Attorney General of Kansas, *Wayne E. Hundley,* Deputy Attorney General, *Steven L. Beshear,* Attorney General of Kentucky, *James M. Ringo,* Assistant Attorney General, *William J. Guste,* Attorney General of Louisiana, *John R. Flowers, Jr.,* Assistant Attorney General, *James E. Tierney,* Attorney General of Maine, *Stephen*

JUSTICE POWELL delivered the opinion of the Court.

This case presents a question as to the standard of proof required to find a vertical price-fixing conspiracy in violation of § 1 of the Sherman Act.

I

Petitioner Monsanto Co. manufactures chemical products, including agricultural herbicides. By the late 1960's, the

*L. Wessler*, Assistant Attorney General, *Stephen H. Sachs*, Attorney General of Maryland, *Charles O. Monk II*, Assistant Attorney General, *Francis X. Bellotti*, Attorney General of Massachusetts, *Alan L. Kovacs*, Assistant Attorney General, *Frank J. Kelley*, Attorney General of Michigan, *Edwin M. Bladen*, Assistant Attorney General, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Stephen P. Kilgriff*, Special Assistant Attorney General, *Bill Allain*, Attorney General of Mississippi, *Robert E. Sanders*, Special Assistant Attorney General, *Mike Greely*, Attorney General of Montana, *Pat Driscoll*, Chief Assistant Attorney General, *Paul L. Douglas*, Attorney General of Nebraska, *Dale A. Comer*, Assistant Attorney General, *Brian McKay*, Attorney General of Nevada, *William E. Isaeff*, Chief Deputy Attorney General, *Gregory H. Smith*, Attorney General of New Hampshire, *Irwin I. Kimmelman*, Attorney General of New Jersey, *Laurel A. Price, Paul Bardacke*, Attorney General of New Mexico, *Robert Abrams*, Attorney General of New York, *Lloyd Constantine*, Assistant Attorney General, *Rufus L. Edmisten*, Attorney General of North Carolina, *H. A. Cole, Jr.*, Special Deputy Attorney General, *John R. Corne*, Associate Attorney General, *Robert O. Wefald*, Attorney General of North Dakota, *Daniel Hobland*, Assistant Attorney General, *Michael C. Turpen*, Attorney General of Oklahoma, *James B. Franks*, Assistant Attorney General, *Dave Frohnmayer*, Attorney General of Oregon, *Richard L. Caswell*, Assistant Attorney General, *Leroy S. Zimmerman*, Attorney General of Pennsylvania, *Eugene F. Waye*, Deputy Attorney General, *Dennis J. Roberts*, Attorney General of Rhode Island, *Faith LaSalle*, Special Assistant Attorney General, *Mark V. Meierhenry*, Attorney General of South Dakota, *Dennis R. Holmes*, Assistant Attorney General, *William M. Leech, Jr.*, Attorney General of Tennessee, *William J. Haynes, Jr.*, Deputy Attorney General, *Jim Mattox*, Attorney General of Texas, *James V. Sylvester*, Assistant Attorney General, *David L. Wilkinson*, Attorney General of Utah, *Stephen G. Schwendiman*, Chief Assistant Attorney General, *Suzanne M. Dallimore*, Assistant Attorney General, *John J. Easton, Jr.*, Attorney General of Vermont, *Glenn R. Jarrett*, Assistant Attorney General, *Gerald L. Baliles*, Attorney Gen-

time at issue in this case, its sales accounted for approximately 15% of the corn herbicide market and 3% of the soybean herbicide market. In the corn herbicide market, the market leader commanded a 70% share. In the soybean herbicide market, two other competitors each had between 30% and 40% of the market. Respondent Spray-Rite Service Corp. was engaged in the wholesale distribution of agricultural chemicals from 1955 to 1972. Spray-Rite was essentially a family business, whose owner and president, Donald Yapp, was also its sole salaried salesman. Spray-Rite was a discount operation, buying in large quantities and selling at a low margin.

Spray-Rite was an authorized distributor of Monsanto herbicides from 1957 to 1968. In October 1967, Monsanto announced that it would appoint distributors for 1-year terms, and that it would renew distributorships according to several new criteria. Among the criteria were: (i) whether the distributor's primary activity was soliciting sales to retail dealers; (ii) whether the distributor employed trained salesmen capable of educating its customers on the technical aspects of Monsanto's herbicides; and (iii) whether the distributor could be expected "to exploit fully" the market in its geographical area of primary responsibility. Shortly thereafter, Monsanto also introduced a number of incentive programs,

eral of Virginia, *Elizabeth B. Lacy*, Deputy Attorney General, *Craig T. Merritt*, Assistant Attorney General, *Chauncey H. Browning*, Attorney General of West Virginia, *Bronson C. La Follette*, Attorney General of Wisconsin, *Michael L. Zaleski*, Assistant Attorney General, *A. G. McClintock*, Attorney General of Wyoming, *Gay Vanderpoel*, Senior Assistant Attorney General, and *Judith W. Rogers*, Corporation Counsel for the District of Columbia.

Briefs of *amici curiae* were filed for the Association of General Merchandise Chains, Inc., by *James F. Rill, James M. Nicholson*, and *Edward T. Borda;* for the Beverly Hills Bar Association by *Eliot G. Disner;* for Dayton-Hudson Corp. by *John D. French* and *James T. Hale;* for the Small Business Legal Defense Committee by *Lawrence A. Sullivan;* and for Senator Howard M. Metzenbaum et al. by *Wesley J. Howard*.

such as making cash payments to distributors that sent salesmen to training classes, and providing free deliveries of products to customers within a distributor's area of primary responsibility.[1]

In October 1968, Monsanto declined to renew Spray-Rite's distributorship. At that time, Spray-Rite was the 10th largest out of approximately 100 distributors of Monsanto's primary corn herbicide. Ninety percent of Spray-Rite's sales volume was devoted to herbicide sales, and 16% of its sales were of Monsanto products. After Monsanto's termination, Spray-Rite continued as a herbicide dealer until 1972. It was able to purchase some of Monsanto's products from other distributors, but not as much as it desired or as early in the season as it needed. Monsanto introduced a new corn herbicide in 1969. By 1972, its share of the corn herbicide market had increased to approximately 28%. Its share of the soybean herbicide market had grown to approximately 19%.

Spray-Rite brought this action under § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. It alleged that Monsanto and some of its distributors conspired to fix the resale prices of Monsanto herbicides. Its complaint further alleged that Monsanto terminated Spray-Rite's distributorship, adopted compensation programs and shipping policies, and encouraged distributors to boycott Spray-Rite in furtherance of this conspiracy. Monsanto denied the allegations of conspiracy, and asserted that Spray-Rite's distributorship had been terminated because of its failure to hire trained salesmen and promote sales to dealers adequately.

The case was tried to a jury. The District Court instructed the jury that Monsanto's conduct was *per se* unlawful if it was in furtherance of a conspiracy to fix prices. In answers to special interrogatories, the jury found that (i) the termination of Spray-Rite was pursuant to a conspiracy be-

---

[1] These areas of primary responsibility were not exclusive territorial restrictions. Approximately 10 to 20 distributors were assigned to each area, and distributors were permitted to sell outside their assigned area.

tween Monsanto and one or more of its distributors to set resale prices, (ii) the compensation programs, areas of primary responsibility, and/or shipping policies were created by Monsanto pursuant to such a conspiracy, and (iii) Monsanto conspired with one or more distributors to limit Spray-Rite's access to Monsanto herbicides after 1968.[2] The jury awarded $3.5 million in damages, which was trebled to $10.5 million. Only the first of the jury's findings is before us today.[3]

The Court of Appeals for the Seventh Circuit affirmed. 684 F. 2d 1226 (1982). It held that there was sufficient evidence to satisfy Spray-Rite's burden of proving a conspiracy to set resale prices. The court stated that "proof of termination following competitor complaints is sufficient to support an inference of concerted action." *Id.*, at 1238.[4] Canvassing the testimony and exhibits that were before the jury, the

---

[2] The three special interrogatories were as follows:

"1. Was the decision by Monsanto not to offer a new contract to plaintiff for 1969 made by Monsanto pursuant to a conspiracy or combination with one or more of its distributors to fix, maintain or stabilize resale prices of Monsanto herbicides?

"2. Were the compensation programs and/or areas of primary responsibility, and/or shipping policy created by Monsanto pursuant to a conspiracy to fix, maintain or stabilize resale prices on Monsanto herbicides?

"3. Did Monsanto conspire or combine with one or more of its distributors so that one or more of those distributors would limit plaintiff's access to Monsanto herbicides after 1968?" 684 F. 2d 1226, 1233 (CA7 1982). The jury answered "Yes" to each of the interrogatories.

[3] See n. 6, *infra*.

[4] The court later in the same paragraph restated the standard of sufficiency as follows: "Proof of distributorship termination *in response to* competing distributors' complaints about the terminated distributor's pricing policies is sufficient to raise an inference of concerted action." 684 F. 2d, at 1239 (emphasis added). It may be argued that this standard is different from the one quoted in text in that this one requires a showing of a minimal causal connection between the complaints and the termination of the plaintiff, while the textual standard requires only that the one "follow" the other. As we explain *infra*, at 763–764, the difference is not ultimately significant in our analysis.

court found evidence of numerous complaints from competing Monsanto distributors about Spray-Rite's price-cutting practices. It also noted that there was testimony that a Monsanto official had said that Spray-Rite was terminated because of the price complaints.

In substance, the Court of Appeals held that an antitrust plaintiff can survive a motion for a directed verdict if it shows that a manufacturer terminated a price-cutting distributor in response to or following complaints by other distributors. This view brought the Seventh Circuit into direct conflict with a number of other Courts of Appeals.[5] We granted certiorari to resolve the conflict. 460 U. S. 1010 (1983). We reject the statement by the Court of Appeals for the Seventh Circuit of the standard of proof required to submit a case to the jury in distributor-termination litigation, but affirm the judgment under the standard we announce today.[6]

---

[5] The court below recognized that its standard was in conflict with that articulated in *Edward J. Sweeney & Sons, Inc.* v. *Texaco, Inc.*, 637 F. 2d 105, 110–111 (CA3 1980), cert. denied, 451 U. S. 911 (1981). Other Courts of Appeals also have rejected the standard adopted by the Court of Appeals for the Seventh Circuit. See *Schwimmer* v. *Sony Corp. of America*, 677 F. 2d 946, 952–953 (CA2), cert. denied, 459 U. S. 1007 (1982); *Davis-Watkins Co.* v. *Service Merchandise*, 686 F. 2d 1190, 1199 (CA6 1982), cert. pending, No. 82–848; *Bruce Drug, Inc.* v. *Hollister Inc.*, 688 F. 2d 853, 856–857 (CA1 1982); see also *Blankenship* v. *Herzfeld*, 661 F. 2d 840, 845 (CA10 1981). The Court of Appeals for the Fourth Circuit has adopted the Seventh Circuit's standard. See *Bostick Oil Co.* v. *Michelin Tire Corp.*, 702 F. 2d 1207, 1213–1215 (1983). One panel of the Court of Appeals for the Eighth Circuit also has adopted that standard, see *Battle* v. *Lubrizol Corp.*, 673 F. 2d 984, 990–992 (1982), while another appears to have rejected it in an opinion issued the same day, see *Roesch, Inc.* v. *Star Cooler Corp.*, 671 F. 2d 1168, 1172 (1982). On rehearing en banc, the Court of Appeals was equally divided between the two positions. Compare *Roesch, Inc.* v. *Star Cooler Corp.*, 712 F. 2d 1235 (1983) (en banc), with *Battle* v. *Watson*, 712 F. 2d 1238, 1240 (1983) (en banc) (McMillian, J., dissenting).

[6] Monsanto also challenges another part of the Court of Appeals' opinion. It argues that the court held that the nonprice restrictions in this case—the compensation and shipping policies—would be judged under a rule of rea-

## II

This Court has drawn two important distinctions that are at the center of this and any other distributor-termination

son rather than a *per se* rule "'only if there is no allegation that the [nonprice] restrictions are part of a conspiracy to fix prices.'" Brief for Petitioner 15 (emphasis deleted) (quoting 684 F. 2d, at 1237). Monsanto asserts that under this holding a mere allegation that nonprice restrictions were part of a price conspiracy would subject them to *per se* treatment. Monsanto contends this view undermines our decision in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977), that such restrictions are subject to the rule of reason.

If this were what the Court of Appeals held, it would present an arguable conflict. We think, however, that Monsanto misreads the court's opinion. Read in context, the court's somewhat broad language fairly may be read to say that a plaintiff must prove, as well as allege, that the nonprice restrictions were in fact a part of a price conspiracy. Thus, later in its opinion the court notes that the District Court properly instructed the jury that "Monsanto's otherwise lawful compensation programs and shipping policies were per se unlawful *if undertaken as part of an illegal scheme to fix prices.*" 684 F. 2d, at 1237 (emphasis added). The court cited *White Motor Co.* v. *United States*, 372 U. S. 253, 260 (1963), in which this Court wrote that restrictive practices ancillary to a price-fixing agreement would be restrained only if there was a *finding* that the two were sufficiently linked. And the Court of Appeals elsewhere noted the jury's finding that the nonprice practices here were "created by Monsanto pursuant to a conspiracy to fix . . . resale prices." 684 F. 2d, at 1233.

Monsanto does not dispute Spray-Rite's view that if the nonprice practices were proved to have been instituted as part of a price-fixing conspiracy, they would be subject to *per se* treatment. See Brief for Petitioner 23–27. Instead, Monsanto argues that there was insufficient evidence to support the jury's finding that the nonprice practices were "created by Monsanto pursuant to" a price-fixing conspiracy. Monsanto failed to make its sufficiency-of-the-evidence argument in the Court of Appeals with respect to this finding, see Brief for Defendant-Appellant Monsanto Co. in No. 80–2232 (CA7), pp. 27–34, and the court did not address the point. We therefore decline to reach it. See, *e. g., Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 147, n. 2 (1970); *Duignan* v. *United States*, 274 U. S. 195, 200 (1927).

In view of Monsanto's concession that a proper finding that nonprice practices were part of a price-fixing conspiracy would suffice to subject the entire conspiracy to *per se* treatment, *Sylvania* is not applicable to this

case. First, there is the basic distinction between concerted and independent action—a distinction not always clearly drawn by parties and courts. Section 1 of the Sherman Act requires that there be a "contract, combination . . . or conspiracy" between the manufacturer and other distributors in order to establish a violation. 15 U. S. C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919); cf. *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960). Under *Colgate*, the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.

The second important distinction in distributor-termination cases is that between concerted action to set prices and concerted action on nonprice restrictions. The former have been *per se* illegal since the early years of national antitrust enforcement. See *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, 404–409 (1911). The latter are judged under the rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition. See *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977).[7]

---

case. In that case only a nonprice restriction was challenged. See 433 U. S., at 51, n. 18. Nothing in our decision today undercuts the holding of *Sylvania* that nonprice restrictions are to be judged under the rule of reason. In fact, the need to ensure the viability of *Sylvania* is an important consideration in our rejection of the Court of Appeals' standard of sufficiency of the evidence. See *infra*, at 763.

[7] The Solicitor General (by brief only) and several other *amici* suggest that we take this opportunity to reconsider whether "contract[s], combination[s] . . . or conspirac[ies]" to fix resale prices should always be unlawful. They argue that the economic effect of resale price maintenance is little different from agreements on nonprice restrictions. See generally *Continen-*

While these distinctions in theory are reasonably clear, often they are difficult to apply in practice.  In *Sylvania* we emphasized that the legality of arguably anticompetitive conduct should be judged primarily by its "market impact." See, *e. g.*, *id.*, at 51.  But the economic effect of all of the conduct described above—unilateral and concerted vertical price setting, agreements on price and nonprice restrictions—is in many, but not all, cases similar or identical. See, *e. g.*, *Parke, Davis, supra*, at 44; n. 7, *supra.*  And judged from a distance, the conduct of the parties in the various situations can be indistinguishable.  For example, the fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions.  A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market.  Moreover, it is precisely in cases in which the manufacturer attempts to further a particular marketing strategy by means of agreements on often costly nonprice restrictions that it will have the most interest in the distributors' resale prices.  The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and

---

*tal T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S., at 69–70 (WHITE, J., concurring in judgment) (citing sources); Baker, Interconnected Problems of Doctrine and Economics in the Section One Labyrinth: Is *Sylvania* a Way Out?, 67 Va. L. Rev. 1457, 1465–1466 (1981).  They say that the economic objections to resale price maintenance that we discussed in *Sylvania, supra*, at 51, n. 18—such as that it facilitates horizontal cartels—can be met easily in the context of rule-of-reason analysis.

Certainly in this case we have no occasion to consider the merits of this argument.  This case was tried on *per se* instructions to the jury.  Neither party argued in the District Court that the rule of reason should apply to a vertical price-fixing conspiracy, nor raised the point on appeal.  In fact, neither party before this Court presses the argument advanced by *amici*. We therefore decline to reach the question, and we decide the case in the context in which it was decided below and argued here.

training additional salesmen or demonstrating the technical features of the product, and will want to see that "free-riders" do not interfere. See *Sylvania, supra,* at 55. Thus, the manufacturer's strongly felt concern about resale prices does not necessarily mean that it has done more than the *Colgate* doctrine allows.

Nevertheless, it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to *per se* treatment and treble damages. On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in *Sylvania* and *Colgate* will be seriously eroded.

The flaw in the evidentiary standard adopted by the Court of Appeals in this case is that it disregards this danger. Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct. As Monsanto points out, complaints about price cutters "are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." Such complaints, particularly where the manufacturer has imposed a costly set of nonprice restrictions, "arise in the normal course of business and do not indicate illegal concerted action." *Roesch, Inc.* v. *Star Cooler Corp.*, 671 F. 2d 1168, 1172 (CA8 1982), on rehearing en banc, 712 F. 2d 1235 (CA8 1983) (affirming District Court judgment by an equally divided court). Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will

reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. See F. Warren-Boulton, Vertical Control of Markets 13, 164 (1978). In sum, "[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute." *Edward J. Sweeney & Sons, Inc.* v. *Texaco, Inc.*, 637 F. 2d 105, 111, n. 2 (CA3 1980), cert. denied, 451 U. S. 911 (1981).[8]

Thus, something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. As Judge Aldisert has written, the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, supra,* at 111; accord, *H. L. Moore Drug Exchange* v. *Eli Lilly & Co.*, 662 F. 2d 935, 941 (CA2 1981), cert. denied, 459 U. S. 880 (1982); cf. *American Tobacco Co.* v. *United States*, 328 U. S. 781, 810 (1946) (Circumstances must reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement").[9]

---

[8] We do not suggest that evidence of complaints has no probative value at all, but only that the burden remains on the antitrust plaintiff to introduce additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy.

[9] The concept of "a meeting of the minds" or "a common scheme" in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.

## III

### A

Applying this standard to the facts of this case, we believe there was sufficient evidence for the jury reasonably to have concluded that Monsanto and some of its distributors were parties to an "agreement" or "conspiracy" to maintain resale prices and terminate price cutters.   In fact there was substantial *direct* evidence of agreements to maintain prices. There was testimony from a Monsanto district manager, for example, that Monsanto on at least two occasions in early 1969, about five months after Spray-Rite was terminated, approached price-cutting distributors and advised that if they did not maintain the suggested resale price, they would not receive adequate supplies of Monsanto's new corn herbicide.   Tr. 1929–1934.   When one of the distributors did not assent, this information was referred to the Monsanto regional office, and it complained to the distributor's parent company.   There was evidence that the parent instructed its subsidiary to comply, and the distributor informed Monsanto that it would charge the suggested price.   *Id.*, at 1933–1934. Evidence of this kind plainly is relevant and persuasive as to a meeting of minds.[10]

An arguably more ambiguous example is a newsletter from one of the distributors to his dealer-customers.   The newsletter is dated October 1, 1968, just four weeks before Spray-Rite was terminated.   It was written after a meeting between the author and several Monsanto officials, *id.*, at 2564, 2571–2573, and discusses Monsanto's efforts to "ge[t] the 'market place in order.'"   App. A–65.   The newsletter re-

---

[10] In addition, there was circumstantial evidence that Monsanto sought agreement from the distributor to conform to the resale price.   The threat to cut off the distributor's supply came during Monsanto's "shipping season" when herbicide was in short supply.   The jury could have concluded that Monsanto sought this agreement at a time when it was able to use supply as a lever to force compliance.

views some of Monsanto's incentive and shipping policies, and then states that in addition "every effort will be made to maintain a minimum market price level." *Id.*, at A–66. The newsletter relates these efforts as follows:

> "In other words, we are assured that Monsanto's company-owned outlets will not retail at less than their suggested retail price to the trade as a whole. Furthermore, those of us on the distributor level are not likely to deviate downward on price to anyone as the idea is implied that doing this possibly could discolor the outlook for continuity as one of the approved distributors during the future upcoming seasons. So, none interested in the retention of this arrangement is likely to risk being deleted from this customer service opportunity. Also, as far as the national accounts are concerned, they are sure to recognize the desirability of retaining Monsanto's favor on a continuing basis by respecting the wisdom of participating in the suggested program in a manner assuring order on the retail level 'playground' throughout the entire country. It is elementary that harmony can only come from following the rules of the game and that in case of dispute, the decision of the umpire is final." *Id.*, at A–66—A–67.

It is reasonable to interpret this newsletter as referring to an agreement or understanding that distributors and retailers would maintain prices, and Monsanto would not undercut those prices on the retail level and would terminate competitors who sold at prices below those of complying distributors; these were "the rules of the game." [11]

---

[11] The newsletter also is subject to the interpretation that the distributor was merely describing the likely reaction to unilateral Monsanto pronouncements. But Monsanto itself appears to have construed the flyer as reporting a price-fixing understanding. Six weeks after the newsletter was written, a Monsanto official wrote its author a letter urging him to

## B

If, as the courts below reasonably could have found, there was evidence of an agreement with one or more distributors to maintain prices, the remaining question is whether the termination of Spray-Rite was part of or pursuant to that agreement. It would be reasonable to find that it was, since it is necessary for competing distributors contemplating compliance with suggested prices to know that those who do not comply will be terminated. Moreover, there is some circumstantial evidence of such a link. Following the termination, there was a meeting between Spray-Rite's president and a Monsanto official. There was testimony that the first thing the official mentioned was the many complaints Monsanto had received about Spray-Rite's prices. Tr. 774, 1295.[12] In addition, there was reliable testimony that Monsanto never discussed with Spray-Rite prior to the termination the distributorship criteria that were the alleged basis for the action. See 684 F. 2d, at 1239. By contrast, a former Monsanto salesman for Spray-Rite's area testified that Monsanto representatives on several occasions in 1965–1966 approached Spray-Rite, informed the distributor of complaints from other distributors—including one major and influential one, see Tr. 126, 135—and requested that prices be maintained. *Id.*, at 109–110, 114. Later that same year, Spray-Rite's president testified, Monsanto offi-

"correct immediately any misconceptions about Monsanto's marketing policies." App. A–98. The letter disavowed any intent to enter into an agreement on resale prices. The interpretation of these documents and the testimony surrounding them properly was left to the jury.

[12] Monsanto argues that the reference could have been to complaints by Monsanto employees rather than distributors, suggesting that the price controls were merely unilateral action, rather than accession to the demands of the distributors. The choice between two reasonable interpretations of the testimony properly was left for the jury. See also Tr. 1298 (identifying source of one complaint as a distributor).

cials made explicit threats to terminate Spray-Rite unless it raised its prices. *Id.*, at 619, 711.[13]

## IV

We conclude that the Court of Appeals applied an incorrect standard to the evidence in this case. The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. Under this standard, the evidence in this case created a jury issue as to whether Spray-Rite was terminated pursuant to a price-fixing conspiracy between Monsanto and its distributors.[14] The judgment of the court below is affirmed.

*It is so ordered.*

---

[13] The existence of the illegal joint boycott after Spray-Rite's termination, a finding that the Court of Appeals affirmed and that is not before us, is further evidence that Monsanto and its distributors had an understanding that prices would be maintained, and that price cutters would be terminated. This last, however, is also consistent with termination for other reasons, and is probative only of the ability of Monsanto and its distributors to act in concert.

[14] Monsanto's contrary evidence has force, but we agree with the courts below that it was insufficient to take the issue from the jury. It is true that there was no testimony of any complaints about Spray-Rite's pricing for the 15 months prior to termination. But it was permissible for the jury to conclude that there were complaints during that period from the evidence that they continued after 1968 and from the testimony that they were mentioned at Spray-Rite's post-termination meeting with Monsanto. There is also evidence that resale prices in fact did not stabilize after 1968. On the other hand, the former Monsanto salesman testified that prices were more stable in 1969–1970 than in his earlier stint in 1965–1966. *Id.*, at 217. And, given the evidence that Monsanto took active measures to stabilize prices, it may be that distributors did not assent in sufficient numbers, or broke their promises. In any event, we cannot say that the courts

JUSTICE WHITE took no part in the consideration or decision of this case.

JUSTICE BRENNAN, concurring.

As the Court notes, the Solicitor General has filed a brief in this Court for the United States as *amicus curiae* urging us to overrule the Court's decision in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911). That decision has stood for 73 years, and Congress has certainly been aware of its existence throughout that time. Yet Congress has never enacted legislation to overrule the interpretation of the Sherman Act adopted in that case. Under these circumstances, I see no reason for us to depart from our longstanding interpretation of the Act. Because the Court adheres to that rule and, in my view, properly applies *Dr. Miles* to this case, I join the opinion and judgment of the Court.

---

below erred in finding that Spray-Rite produced substantial evidence of the concerted action required by § 1 of the Sherman Act, and that—despite the sharp conflict in evidence—the case properly was submitted to the jury.