79 F.3d 1154
 1996-1 Trade Cases P 71,340, RICO Bus.Disp.Guide 9004
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff-Appellant,
v.
HOWARD P. FOLEY COMPANY, INC., et al., Defendants-Appellees.
 No. 94-16162.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 5, 1995.
Decided March 6, 1996.
 
 1
 Before: GOODWIN and REINHARDT, Circuit Judges, and KING,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Plaintiff, Pacific Gas & Electric Company ("PG & E" or "Plaintiff" or "Appellant"), sought treble damages for the period 1972-1977 during which it paid Defendant Howard P. Foley Company, Inc. ("Foley") contracting company cost-plus 15%, a rate which PG & E alleges was possible only as a result of bid-rigging in violation of either the Sherman Act or RICO or both. PG & E alleges that a competitive fee during that time period would have been between cost-plus 4% and cost-plus 8%. PG & E calculates the excess fees as between $3.5 million and $4.6 million. PG & E also sought to recover as damages, to be trebled, the cost of financing these excess charges and calculates these financing costs as between $17.5 million and $22.4 million.
 
 
 4
 After a long jury trial in which the jury was unable to agree on a verdict, the court declared a mistrial. The court then considered Fischbach & Moore's motions for judgment as a matter of law, pursuant to Rule 50(a) at the close of PG & E's case and pursuant to Rule 50(b) after the parties had rested, and granted both motions. PG & E argues that a new trial should have been ordered.[1]
 
 I.
 
 5
 The excess charges alleged by PG & E were incurred in the course of the construction for PG & E of a two-unit nuclear power plant called Diablo Canyon. The plant was built over a period of more than 17 years from the issuance of initial regulatory approvals on November 7, 1967, using independent contractors in many trade disciplines under PG & E's direct supervision.
 
 
 6
 The final cost of constructing Diablo Canyon, including financing costs, was approximately $5.6 billion. The largest single contractor at the plant was the Howard P. Foley Co., Inc., which performed most of the required electrical work. PG & E paid Foley at least $425 million for its work at Diablo Canyon.
 
 
 7
 PG & E let three contracts for electrical work at Diablo Canyon, designated as Contract 8807, Contract 8802, and Contract 8808, which are relevant to this case. Any electrical contractor interested in bidding for work at Diablo Canyon had to qualify itself as competent.
 
 
 8
 In March 1969, PG & E invited a number of electrical contractors, including Fischbach, to qualify. Subsequently, PG & E invited the qualified bidders to submit competitive bids for Contract 8807 in three distinct parts--a "lump sum" or "fixed" price, a "cost-plus" price, and several "unit" prices. Fischbach, Foley, and others submitted bids which were evaluated by PG & E. In February 1970, PG & E awarded Contract 8807 to the low bidder, Foley, an original defendant in the suit filed by PG & E.
 
 
 9
 Some time later, PG & E issued plans and specifications for Contract 8808 and received seven bids, in the same tripartite format as for Contract 8807, including one from Fischbach. In July 1971, Contract 8808 was awarded to Wismer & Becker Contracting Engineers, Inc. ("Wismer & Becker"), another original defendant in the suit filed by PG & E.
 
 
 10
 On July 29, 1971, shortly after awarding Contract 8808, PG & E invited Foley, Wismer & Becker, and L.K. Comstock & Company, Inc. ("Comstock") to submit bids for Contract 8802. Wismer & Becker did not bid. The contract was awarded to Foley as the lower bidder.
 
 
 11
 Once Foley was on-site performing Contracts 8807 and 8802, PG & E decided to consolidate those contracts into one. Effective September 1, 1972, the remaining work under Contract 8807 was "rolled into" Contract 8802 and under the price terms of Contract 8802.
 
 
 12
 On December 17, 1973, PG & E and Foley agreed to modify the price terms of Contract 8802. The parties agreed that work performed at Diablo Canyon by Foley retroactively from February 24, 1972 and thereafter would be paid for on a cost-plus 15% fee basis instead of the cost-plus 25% fee in Foley's bid. This fee change was effective through the end of 1976 and into early 1977.
 
 
 13
 In February 1977, as construction of Diablo Canyon was thought to be nearing completion, PG & E invited Foley and several non-electrical contractors to bid for finishing up all remaining work on a variety of construction tasks which PG & E referred to generally as "clean-up" work. Foley submitted a low bid and also promised in its bid that, if chosen, it would change its cost-plus 15% fee for Contract 8802 work to a sliding fee starting at 7.5% and moving down to 5%. PG & E awarded the clean-up work to Foley and modified the price terms of Contract 8802 to reflect Foley's proposal. Accordingly, all of the electrical work performed by Foley at Diablo Canyon for the next eight years (1977-1985), amounting to hundreds of millions of dollars, was performed at an average price of about cost-plus 5%.
 
 
 14
 As set forth earlier, PG & E seeks damages only for the five-year period 1972-1977 during which Foley charged PG & E cost-plus 15%, a rate which PG & E alleges would have been between cost-plus 4% and cost-plus 8% if the bidding had not been rigged in violation of the Sherman Act or RICO or both. Although not set forth more specifically in any of the pleadings or briefs, this period would presumably be from February 24, 1972, to the date in 1977 when the 15% fee under Contract 8802 was modified to a sliding scale.
 
 II.
 
 15
 A district court's decision to grant judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 is reviewed de novo. Montiel v. City of Los Angeles, 2 F.3d 335, 342 (9th Cir.1993). The standard for reviewing the district court's grant of a directed verdict is de novo. Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir.1994); Zamalloa v. Hart, 31 F.3d 911, 913 (9th Cir.1994).
 
 
 16
 A directed verdict (or judgment as a matter of law) is proper when the evidence permits only one reasonable conclusion. Berry, 39 F.3d at 1057. The motion should be granted only if the facts and inferences point so strongly in favor of the moving party that reasonable persons could not arrive at a contrary verdict, i.e., that the jury acted unreasonably in coming to its verdict. Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1151-52 (9th Cir.1988). "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." Id.
 
 A. EVIDENCE OF A BID-RIGGING CONSPIRACY
 1. Relevant Background
 
 17
 In the district court's Order filed on July 14, 1992, the trial judge lists the then known evidence of bid-rigging among electrical contractors relevant to the Diablo Canyon project.
 
 
 18
 The judge noted that there was "no real dispute that some of the bidders for the electrical work at Diablo Canyon engaged in bidding improprieties." However, it was "less clear (1) that PG & E suffered any injury due to these improprieties, and (2) that each Defendant behaved improperly with respect to each contract."
 
 
 19
 Regarding injury, PG & E contends that the bid-rigging conspiracy proximately caused PG & E to negotiate one-on-one with the winner of Contract 8802, that is, Foley, and to modify that contract to include more work (whatever was left to be done under Contract 8807) at a better rate to Foley than the winning bid should have required if there had been no bid-rigging. PG & E contends further that Foley was thereby enabled to underbid other contractors for non-electrical work by incorporating as part of its bid an offer to reduce the super-competitive payment terms under Contract 8802 to a competitive level.
 
 
 20
 Regarding the extent of each defendant's liability, PG & E contends that there was a single overarching conspiracy among all defendants to allocate all of the electrical work at Diablo Canyon (and elsewhere in the Western United States), rather than a separate conspiracy for each bid. Thus all defendants as co-conspirators would be liable for the totality of PG & E's bid-rigging injury proximately caused by any one or more of the conspirators even though the evidence does not connect each defendant with each rigged bid.
 
 2. Elements of a Sherman Act § 1 Claim
 
 21
 Section 1 of the Sherman Act generally proscribes any "contract, combination or conspiracy" that unreasonably restrains the nation's domestic or foreign commerce. 15 U.S.C. § 1. As construed by the courts, Section 1 broadly prohibits concerted action that "unreasonably" restrains the nation's domestic or foreign trade. See, e.g., National Society of Professional Engineers v. United States, 435 U.S. 679, 690 (1978), and Standard Oil Co. v. United States, 221 U.S. 1, 65 (1911).
 
 
 22
 The coverage of Section 1 of the Sherman Act is necessarily directed at concerted action only. Thus, an actual concert of action between at least two separate persons or entities must first be demonstrated. United States v. Trenton Potteries Co., 273 U.S. 392 (1927).
 
 
 23
 Typically, the existence of a contract, combination or conspiracy must be inferred from circumstantial evidence. Virtually any evidence may be used for this purpose if it indicates that the parties entered into an "understanding" or "agreement" to take joint action. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984). Merely coincidental behavior that can be explained on legitimate business grounds does not, however, in itself establish a conspiracy if it is equally indicative of a series of unilateral actions. City of Long Beach v. Standard Oil Co. of Cal., 872 F.2d 1401 (9th Cir.1989), cert. denied 493 U.S. 1076 (1990).
 
 3. Evidence Presented
 
 24
 In its Opposition to Defendants' Rule 50(a) Motion re Sherman Act, PG & E offered evidence from which the jury "could infer" that Fischbach had the requisite knowledge, motive, plan and intent to rig large electrical jobs in the Bay Area.
 
 
 25
 The only "direct evidence" that PG & E has proffered in its brief was the testimony by Mr. Brown, Foley's first Bay Area manager. In his cross examination at trial, Brown stated that, with regard to Contract 8807, "Mr. Hatten told me that [Hatten] controlled all people that was bidding that job." Mr. Hatten was the Bay Area manager for the L.K. Comstock Company, one of Foley's competitors. This is the only evidence of any conspiratorial agreements about which Brown testified he had personal knowledge. Moreover, the district court had stricken that statement as hearsay concerning Hatten's statements.
 
 
 26
 PG & E provided the following circumstantial evidence that the district court laid out in its June 3, 1994 Order:
 
 
 27
 (1) Fischbach, through Francis Kellstrom and Jerome Littman agreed to a "silent joint venture" with Charles Berrell of Foley to rig a job at the Shell Oil refinery in Martinez, California.
 
 
 28
 (2) William Earl, Fischbach's branch manager, admitted that he probably gave complimentary bids to other electrical contractors.
 
 
 29
 (3) Fischbach qualified to bid as an electrical subcontractor on a civil contract prior to bidding on contract 8807. PG & E contends that this led to the conspiratorial agreement between Fischbach, Comstock, Lord Electric and Foley. Specifically, PG & E points to Brown's testimony indicating that prior to bidding on contracts 8807 and 8802, the contractors determined that those contracts would go to Comstock.
 
 
 30
 (4) Brown attended at least one meeting at the Walnut Creek Inn, where representatives from other contractors, including Fischbach, urged him to agree to Comstock's right to be the lowest bidder on all electrical work at Diablo Canyon.
 
 
 31
 (5) Brown told Comstock what Foley intended to bid for contract 8807. PG & E argued that the jury could infer that Fischbach obtained bid information in advance because the same happened to Lord Electric, another bidder.
 
 
 32
 (6) Fischbach's bid on contract 8807 was higher than Foley's, which PG & E asserts evidences that Fischbach participated in the conspiracy.
 
 
 33
 (7) William Earl's admission that he signed the names of Fischbach's president and corporate secretary on the bid for 8807 without obtaining their authorization to do so. PG & E argues that the jury can infer that there was no need for authorization because Earl and even Kellstrom knew that Fischbach's bid was a complimentary bid.
 
 
 34
 (8) After Foley was declared the winner of contract 8807, but before PG & E solicited bids for contract 8802, Brown met with Charles Berrell in Salt Lake City to discuss a pay-off by Foley to Comstock. At that meeting, Foley promised and Comstock agreed to accept $375,000 in return for which Foley would be the low bidder on 8802. According to PG & E, the jury can infer from this evidence that Comstock controlled the other bidders and that Fischbach was one of them. In PG & E's opinion, it would make no sense for Foley to make a payoff for the outcome on 8807 and 8802 unless there was no risk of competition from Fischbach and Lord Electric, the other contractors who could have bid for the job.
 
 
 35
 (9) A year after the Salt Lake City meeting, Brown met with Hatten and Albrecht (of Wismer & Becker) and flipped coins for contract 8808. PG & E maintains that the jury can infer from this that Fischbach's and Lord's bid for that contract were known to be losing bids, since that result was predetermined by the coin toss.
 
 
 36
 (10) Brown did not include any pay-off for Comstock when he prepared Foley's bid for contract 8802, although he did include $250,000 for Wismer & Becker. PG & E asserts that this clearly shows that the promised $375,000 pay off to Comstock had already been satisfied, by the earlier Washington Metro trade-off. PG & E asserts that this proves there was no threat of competition from Fischbach even before the bids for 8802 were submitted.
 
 
 37
 (11) The absence of evidence that Fischbach ever made a sales call on PG & E after contract 8802 was awarded to Foley. PG & E insists that such a call is standard practice in a truly competitive market.
 
 
 38
 (12) In light of evidence that large jobs like Diablo Canyon were rigged at the highest corporate levels, the jury could infer that other executives at Comstock spoke to Fischbach and informed Hatten of the results of those conversations.
 
 
 39
 The Supreme Court discussed the implications of circumstantial evidence in a case involving allegations of antitrust conspiracy. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1988). The Court stated that the plaintiff must come forward with "sufficiently unambiguous" evidence " 'that tends to exclude the possibility' " that the defendants were acting lawfully. Id. at 588, citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 763-64 (1984).
 
 
 40
 The question becomes whether, on the evidence presented, the protection of innocent independent conduct outweighs the costs associated with the potential decrease in strict antitrust enforcement. If it does, then the plaintiff must come forward with additional, "sufficiently unambiguous" evidence that does not have these undesirable deterrent effects. In re Coordinated Pretrial Proceedings, 906 F.2d 432, 439 (9th Cir.1990), cert. denied 500 U.S. 959 (1991).
 
 
 41
 We find that the evidence regarding the meetings amongst the contractors is sufficient to allow a reasonable juror to conclude that Fischbach engaged in "contract, combination or conspiracy" that unreasonably restrains the nation's domestic or foreign commerce, in violation of the Sherman Antitrust Act § 1. We therefore reverse on this issue and remand for further proceedings.
 
 B. EVIDENCE OF RICO VIOLATION
 
 42
 PG & E also alleges that Fischbach's actions constituted violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"). More specifically, PG & E bases its allegations on sections 1962(c) and 1962(d), a substantive RICO claim and RICO conspiracy claim, respectively. Because the elements for the Sherman Antitrust Act violation claim differ from the elements of RICO violations, we next examine the RICO claims separately.
 
 1. Substantive RICO Claim
 
 43
 Section 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in interstate commerce, to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. PG & E argues that the district court erred when it found that there was inadequate evidence to establish "continuity." For the reasons set forth below, we agree with the district court and affirm.
 
 
 44
 a. Enterprise
 
 
 45
 The first element in a RICO § 1962(c) action is that there be proof of a RICO "enterprise." "Enterprise" is defined in § 1961(4) of the Act "as any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The statutory definition applies to both civil and criminal RICO actions. The definition of "enterprise" encompasses any type of formal, legal entity and allows RICO plaintiffs considerable scope.
 
 
 46
 The Supreme Court has defined a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). Proof of the existence of an enterprise is made "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Id.
 
 
 47
 In Turkette, the Supreme Court resolved a split among the circuits by holding that, for RICO purposes, either legitimate or illegitimate associations of individuals united for illicit purposes could constitute an enterprise. 452 U.S. at 584-85. The enterprise must be shown to have an existence separate and distinct from the pattern of racketeering activity engaged in by its members or associates. This distinction is, of course, simple to perceive and to show when a legal entity is alleged as the RICO enterprise. When, as in this case, the alleged enterprise is an "association-in-fact," it is quite often considerably more difficult to show the requisite degree of separateness.
 
 
 48
 In River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458 (9th Cir.1992), the Ninth Circuit followed Turkette in finding that "a group of individuals or corporations may together constitute a RICO enterprise even though they do not incorporate or otherwise form a legal entity." 960 F.2d 1458, 1461. While showing the separate existence of the enterprise, a § 1962(c) plaintiff must also prove that a nexus exists between the enterprise and the pattern of racketeering activity. The pattern of racketeering activity is employed as a means of conducting, or participating in, the affairs of the enterprise. Because we find that there was a lack of continuity, PG & E has failed to establish the element of a pattern of racketeering activity. It is this element that we focus on now.
 
 
 49
 b. Pattern of Racketeering
 
 
 50
 The RICO statute defines a "pattern of racketeering activity" as two or more acts of racketeering, one of which occurred after the passage of the RICO Act and within ten years of the date of the other act of racketeering. 18 U.S.C. § 1961(5). The test for establishing the pattern of racketeering activity is relationship plus continuity. This flexible, common-sense test is applied on an ad hoc basis.
 
 
 51
 The relationship prong of the test relates to a showing that the alleged racketeering acts are related to each other in terms of similarity of acts, victims, or methods. The continuity prong relates to the magnitude of the scheme, i.e., the longer a scheme lasts, the more likely it is that continuity will be found. Mostly, the pattern essentially defines the magnitude of the alleged racketeering activity.
 
 
 52
 In 1989, the Supreme Court expanded on the concept of "continuity plus relationship." In H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), the RICO complaint at issue alleged that over a six-year period, the Northwestern Bell Telephone Company had been engaged in a variety of actions to improperly influence telephone rate-making decisions of the Minnesota Public Utilities Commission, causing the Commission to set telephone rates in excess of a fair and reasonable amount. The alleged improprieties included payments of cash to commissioners; offers of future employment; and providing various forms of entertainment. 492 U.S. at 233.
 
 
 53
 The outer limits of judicial liberality on the pattern of racketeering issue since H.J. were demonstrated in Ikuno v. Yip, 912 F.2d 306 (9th Cir.1990). In this RICO action brought by investors against a commodities firm based in Hong Kong, an attorney who had filed two annual reports for the firm sought summary judgment as to himself on the basis that a pattern of racketeering was lacking. This Court, in Ikuno, said that there is "no talismanic number" of predicate acts for a pattern but noted that H.J. indicated that two predicates could create a pattern in certain circumstances. 912 F.2d at 309. In Ikuno, the filing of two allegedly false annual reports by the attorney carried the threat of continuity as the filings would have continued indefinitely but for the fact the commodities firm ceased doing business. Id.
 
 
 54
 Similarly, in Ticor Title Ins. v. Florida, 937 F.2d 447 (9th Cir.1991), the Court affirmed a bench trial judgment in favor of the plaintiffs. In Ticor, the predicate offenses were three forgeries of IRS tax lien releases over a 13-year period. As in Ikuno, the Court did not focus on a strictly numerical analysis. It found the predicate acts were related to each other by similar purposes and methods of commission and that the threat of continuity was present because the activity was becoming a regular way of doing business by defendants. 937 F.2d at 450-51.
 
 
 55
 c. Evidence Provided by PG & E
 
 
 56
 The main problem with PG & E's evidence is that it fails to establish the continuity element that is required for the RICO claim. PG & E offered the following evidence at trial:
 
 
 57
 (1) Fischbach's invitation to Foley to join the group. In support of this contention, PG & E notes Brown's testimony that he travelled with Charles Berrell, his boss, to Salt Lake City in 1965 to meet Jerry Littman, manager of Fischbach's San Francisco office, and Francis Kellstrom, Fischbach's president, regarding the Shell Oil refinery job.
 
 
 58
 (2) Brown's testimony that Berrell, Matthew Kammenzind of Lord Electric and Hank Dias of Contra Costa Electric urged him to cooperate with the group of Bay Area managers and play by its rules. PG & E notes that this group included Fischbach.
 
 
 59
 (3) Korman's phone call to Brown asking him if he would "go along" and telling him they could work something out.
 
 
 60
 (4) Korman's trial testimony that (a) as soon as he arrived in San Francisco, he was invited to a meeting with branch managers from the five national contractors at the Walnut Creek Inn to discuss the allocation of jobs and (b) another meeting with a similar agenda took place in Benecia.
 
 
 61
 (5) The Brown-Kleinhoff and Brown-Kammenzind phone calls discussing payoffs and cooperating with one another.
 
 
 62
 (6) Rick Erwin's testimony that the enterprise continued into the late 1970s and possibly into the early 1980s and that he was present when competitors negotiated jobs.
 
 
 63
 From this evidence, a reasonable juror could not find that Fischbach's alleged acts amounted to or threatened a continuing criminal activity. At most, PG & E has presented circumstantial evidence of suspect conduct that does not amount to a pattern of racketeering in violation of RICO. Upon making a fact-specific inquiry of the record, we find that although the few instances that PG & E allege may be sufficient to allow a reasonable juror to find Sherman Antitrust Act violations, they do not suffice to meet RICO's pattern requirement.
 
 
 64
 The district court accurately found that PG & E failed to present sufficient evidence to establish a RICO claim.
 
 2. RICO Conspiracy Claim
 
 65
 Section 1962(d) makes it unlawful for any person to conspire to violate the provisions of § 1962(a), (b), or (c). This final subdivision of the statute defines activities that violate RICO. The majority rule is that a RICO conspiracy is shown by (1) the existence of an enterprise and (2) the agreement of the defendants to participate in the affairs of the enterprise through the commission of two or more predicate offenses by any co-conspirator. Baumer v. Pachl. 8 F.3d 1341 (9th Cir.1993).
 
 
 66
 Recently, the Supreme Court provided its interpretation of the § 1962(c) requirement that the defendant "conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs...." Reves v. Ernst & Young, No. 91-886, slip op. at 7 (1993). The Reves Court narrowly interpreted the phrase, concluding that for liability to attach "one must participate in the operation or management of the enterprise itself." Id. at 8-9. "RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." Id. at 9.
 
 
 67
 The heart of the RICO conspiracy claim is the agreement. Where there is such an agreement, a RICO conspiracy may exist even if the underlying RICO violations of § 1962(a), (b) or (c) were not carried out.
 
 
 68
 Although PG & E has stated the existence of such an agreement, it did not present any evidence that Fischbach or any of its employees agreed to commit a pattern of predicate offenses or that they agreed that the pattern of predicate offenses would be the means by which the conspirators would participate in the operation or management of the enterprise. Thus, we affirm on the RICO conspiracy claim.
 
 C. PROOF OF COST OF CAPITAL DAMAGES
 
 69
 Although the outcome of this issue might have been different had we reversed on the RICO claims, we find that the district court erred in excluding the cost of capital damages evidence. We therefore reverse on this issue.
 
 
 70
 The district court previously granted PG & E's summary judgment motion, finding that "cost of capital" damages were recoverable. The court stated that
 
 
 71
 ... PG & E seeks to recover not only the excess fees it incurred because of the overarching conspiracy to rig the bids for electrical work on the Diablo Canyon Nuclear Power Plant, but also the excess finance charges engendered by the excess fees it paid.
 
 
 72
 In its Order Denying Defendants' Motion for Reconsideration of this Court's Order of July 27, 1993 Granting PG & E's Motion for Summary Judgment as to Cost of Capital Damages, the district court clarified that,
 
 
 73
 [c]ost of capital is an out-of-pocket expense. Prejudgment interest is not. The latter accrues during the pendency of an action. The former flows directly from conduct upon which the action is based. PG & E's claim for cost of capital damages arises from Defendants' allegedly wrongful conduct, not from the fact that its recovery has been delayed by the pendency of this action.
 
 
 74
 The district court also stated that "if PG & E financed only 75 percent of the entire project, it can recover finance charges only on 75 percent of the overcharges it incurred on Contract 8802." Id. at 6.
 
 
 75
 The district court later found that it would not allow recovery on any equity financing cost-of-capital damages, stating that the law only supported the recovery of debt financing costs. Since PG & E failed to prove what portion of the total construction cost was financed using debt, equity or retained earnings, the district court found that PG & E did not produce sufficient evidence for a reasonable jury to conclude the specific amount of excess finance costs it incurred on borrowed funds.
 
 
 76
 PG & E argues that it should have been given more latitude in proving the extent of damages caused by Fischbach's alleged conspiracy. It cites principally to Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp., 1992 WL 121726, 1992 U.S. Dist. LEXIS 7721 (N.D.N.Y.1992), for the proposition that equity and debt financing are identical costs. It is true that this case allowed the plaintiff to present evidence of financing costs as part of the damages arising from the defendant's alleged tortious conduct. 1992 WL 121726 at * 31, 1992 U.S. Dist. LEXIS 7721 at * 107. The Niagara court stated that all that is required is that a plaintiff's proof of financing costs damages be "commercially reasonable and foreseeable under the circumstances." Id. at * 32, 1992 U.S. Dist. LEXIS 7721 at * 117, citing LILCO v. IMO Industries, 1990 WL 64588 at * 4-5, 1990 U.S. Dist. LEXIS 5351 at * 16.
 
 
 77
 In a footnote that PG & E highlights, the Niagara court indicated that plaintiff's chief financial officer was going to testify that plaintiff raised money to pay for the costs by selling preferred stock and common stock, issuing long-term and short-term securities and making substantial borrowing, and incurred a finance cost on each source. Id. at * 32 n. 72, 1992 U.S. Dist. LEXIS at * 116 n. 72. Again, this does not establish that the Niagara court really considered the equity versus debt issue.
 
 
 78
 In considering this issue, the distinction between financing costs through debt as opposed to equity is illogical. If a plaintiff actually established a conspiracy, then the plaintiff should recover finance costs, regardless of where the plaintiff got the funds.
 
 
 79
 As with the recoverability of other types of damages, the amount is a question of fact. But the damages must be reasonably certain and traceable to the breach, not remote or the result of other intervening causes. PG & E may have met this requirement if a conspiracy is indeed established.
 
 
 80
 Based on the foregoing, we find that the district court should not have excluded the evidence on this issue. For the foregoing reasons, we REVERSE and remand for further proceedings on both the Sherman Antitrust claim and the damages issue, and AFFIRM on the RICO claims.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The orignal complaint named nine corporations and eight individuals. Prior to the commencement of trial on November 1, 1993, PG & E had reached settlements with all of the non-Fischbach defendants except for Bancroft T. Foley who was defaulted for non-appearance at the trial. Trial commenced against only Fischbach & Moore, Inc. and two of the individuals who had been officers of Fischbach & Moore at relevant times. Motions for judgment as a matter of law were made by the two individuals as well, but they finalized a settlement with PG & E before the court's order and were therefore dismissed from this action. Fischbach Inc. seems to have slipped through the cracks
 A separate appeal, No. 94-16379, had been consolidated with this appeal, but that appeal was settled under the Settlement Conference Program.