IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-11002
_____


ALFRED R. JOHNSON, D.O., ET AL.,

                                             Plaintiff-Appellees,
                                              Cross-Appellants,

                          versus

HOSPITAL CORPORATION OF AMERICA, ET AL.,

                                                   Defendants,

BEDFORD NORTHEAST COMMUNITY HOSPITAL,
INC., ET AL.,

                                          Defendants-Appellants,
                                              Cross-Appellees.

_____

         Appeals from the United States District Court for the
                    Northern District of Texas
_____

                        September 23, 1996

Before JOLLY, DUHÉ, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

     William J. Rea, M.D. and Alfred R. Johnson, D.O. sued the

hospital where they formerly practiced, Bedford Northeast Community

Hospital (the "Hospital"), its parent corporation, HCA Health

Services of Texas, Inc. ("Health Services"), the Hospital's

administrator, Robert M. Martin, and its chief of staff, Dr. Jim

Linton, and three doctors, Drs. Barry Firstenberg, Richard

Feingold, and Paul Haberer, who served on an ad hoc Hospital

committee to investigate complaints made against Rea and Johnson, which resulted in the suspension of their admitting privileges. Rea and Johnson alleged that the Hospital's suspension of their admitting privileges and its later decision to close the unit to which they admitted patients violated federal antitrust law. They also asserted pendent state law claims of breach of contract, fraud, negligent misrepresentation, slander and business disparagement and tortious interference with contractual relations. After a bench trial, the district court held that the Hospital, Linton, Martin, and Haberer tortiously interfered with Rea and Johnson's contractual relations with their patients. The district court denied all other claims. The district court awarded Rea and Johnson both compensatory and exemplary damages.

We have before us an appeal and cross-appeal. The defendants appeal the award of damages for tortious interference with business relations, arguing that the only damages proved at trial were damages of Rea and Johnson's professional association, for which they lack standing to seek recovery. The defendants also argue that the Hospital's decision to close the unit to which Rea and Johnson admitted patients is protected by the affirmative defense of legal justification, and that the defendants are entitled to immunity in connection with the summary suspension of Rea and Johnson's admitting privileges. Rea and Johnson cross-appeal the denial of their antitrust and business disparagement claims. The overarching question before us, thus, is whether Rea and Johnson

have proved that they are entitled to damages under any theory that they assert on appeal and, if so, in what amount. We begin with a review of the relevant facts.

I

Rea and Johnson practice environmental medicine. This practice involves the treatment of patients with chronic pain or disease that is believed to be caused or aggravated by chemicals or other agents found in the patient's environment. Before the suspension of their hospital privileges, Rea and Johnson admitted patients to the Environmental Care Unit ("ECU"), a part of the Hospital's Internal Medicine Department.

The Hospital's relationship with Rea and Johnson had been tumultuous for some time before their suspension, arising from a Medicare inspection in September of 1986. Its importance was heightened because Medicare receipts made up nearly one-half of the Hospital's gross revenue. The inspection uncovered several deficiencies that, unless timely remedied, would result in the loss of the Hospital's Medicare payments. Among the deficiencies noted by Medicare was the use of antigens in the ECU.[1] Medicare requires that any medication administered in the Hospital, including antigens, be properly labeled, dispensed through the Hospital's pharmacy, and come from an FDA-approved source. Rea and Johnson

_____

[1]Rea and Johnson administered the antigens in small doses to their patients in order to determine the patient's sensitivity to the substance.

manufactured the antigens themselves.  They were not an FDA-approved source.[2]  Martin notified Rea and Johnson that they would no longer be able to use the antigens in the Hospital until a suitable alternative source was found.  Martin also advised the doctors that their reappointment and privileges could be in jeopardy if their recalcitrance continued.  Irrespective of these instructions, Rea and Johnson continued to provide antigens to their patients, but only for self-administration.

Other sources of friction arose between the Hospital and Rea and Johnson.  After learning that Rea and Johnson violated hospital policy by rendering medical services to patients in the "ECU Hotel," which consisted of several rooms adjacent to the ECU used by the families of ECU patients "almost as a hotel," the Hospital decided to close it.  Coinciding with its closure of the ECU Hotel, the Hospital also instituted a cash-only policy for ECU patients. The Hospital took this action after experiencing problems in bill collection when insurance coverage was denied to several ECU patients.

The immediate impetus for the Hospital's suspension of Rea and Johnson's admitting privileges--one of two factual bases for the

---

[2]Rea and Johnson also manufactured and administered "transfer factor," a blood product that is used to fight infections and enhance the immune system.  Because transfer factor is an "investigational drug" requiring approval of the Hospital's Internal Review Board, which had not approved it, the Hospital directed Rea and Johnson not to administer it at the Hospital. Notwithstanding this instruction, they administered transfer factor to at least one patient after the prohibition.

present suit--occurred in January of 1987, less than six months after Medicare inspected the Hospital. The dispute began when the Hospital's Director of Pharmacy, Mike Warmington, notified Martin, the hospital administrator, of concerns he had about the drug regimen of two ECU patients under the care of Rea and Johnson.

On January 22, 1987, the Hospital's Medical Executive Committee ("MEC") met. The MEC was composed of the elected heads of the Hospital's various departments. During that meeting, Martin relayed Warmington's concerns. Martin also raised the Hospital's earlier problems with Rea and Johnson surrounding the use of antigens and transfer factor in the ECU. Linton, the Hospital's chief of staff, and Firstenberg, the chairman of internal medicine, both expressed some concern that the Hospital's previous inquiry into antigen use was being brought up again now. Feingold recommended that the MEC bring in an outside consultant to investigate the charges against Rea and Johnson. Disregarding Feingold's suggestion, Linton appointed an ad hoc committee (the "Committee") to review the charts of certain ECU patients.[3] The

[3]The Hospital's Bylaws provide for the summary suspension of admitting privileges "whenever action must be taken immediately in the best interest of patient care . . . ." Hospital Bylaws § 8.2. The Bylaws further require, however, that complaints about doctors be submitted in writing to the MEC, which is then to forward the complaint to the department head where the activities occurred-- here, the Department of Internal Medicine. Bylaws § 8.1-1-5. The department head is then required to investigate the matter or appoint an ad hoc committee to investigate. Hospital Bylaws § 8.1-3. A written report of the investigation is then sent to the MEC, which may then take action. Id.

Under this framework, Firstenberg, as the Chairman of Internal

Committee consisted of defendants Drs. Feingold and Firstenberg, defendant Dr. Paul Haberer, a former chief of staff at the Hospital, and a fourth member not named as a defendant, Dr. Jeffrey Mills.

Twenty-two days after its appointment, on February 13, 1987, three members of the Committee, Mills, Haberer, and Feingold, met for the first time to review the charts of four ECU patients. Firstenberg, who was out of town, did not attend the meeting. The Committee spent two hours reviewing the charts, but prepared no written findings or recommendations after its review. The charts showed that Johnson gave one patient four times the daily recommended dose of Halcion, a level described as toxic in the 1986 Physician's Desk Reference. A second patient received six times the daily recommended dosage of Halcion, while simultaneously receiving a second drug that "potentiates" or make stronger the effect of Halcion. At least one patient appeared from the charts to be addicted to narcotic pain killers. Other patients demonstrated depression and suicidal ideations for which no psychiatric evaluation was performed or treatment provided. Haberer reported the Committee's findings to Linton by telephone after the meeting, describing the situation as a "shooting gallery."

Medicine, alone had authority to appoint the members of the Committee.

On the morning of February 16, 1987, Martin and Linton met to discuss the Committee's findings as orally reported to them by Haberer. Feingold and Mills confirmed Haberer's report. Joined by Firstenberg, who had been absent from the Committee's meeting on February 13, Martin and Linton summoned Johnson. Johnson was informed that the Hospital was suspending his and Rea's admitting privileges immediately, but that the doctors' treating privileges were being suspended effective February 18, 1987, at noon. Both actions were taken pending further investigation of the doctors' medical practices through the Hospital's Fair Hearing Process, set forth in its Bylaws. The Hospital argues on appeal that it did not immediately suspend the doctors' treatment privileges in order to allow them "to make arrangements for new doctors to take over the care of the patients." Despite the promise Johnson made during the meeting to arrange substitute care, he did not. Martin and Linton arranged substitute physicians for the ECU patients.

The Hospital confirmed its suspension of Rea and Johnson by letter the same day, stating that suspensions were based upon § 8.1-4(a)-(f) of the Hospital's Bylaws, which governs summary suspensions. The letter gave no specific reason for the suspension. Sometime after the meeting concluded, Firstenberg and Linton each reviewed for the first time the ECU charts that triggered the Hospital's suspension of Rea and Johnson.

On February 19, 1987, the MEC met to review the suspension and voiced considerable concern for the ECU patients' safety. The MEC

voted unanimously to continue Rea and Johnson's suspension.  On February 26, the MEC met a second time to consider the suspension.  At this meeting, Rea and Johnson each spent an hour answering questions from the MEC regarding their treatment of patients.  Following the doctors' appearance, the MEC voted unanimously a second time to affirm the summary suspension pending a full hearing before the Fair Hearing Committee.

On March 26, 1987, the day before the Fair Hearing Committee met to consider the suspension, Martin closed the ECU.  At the time, the ECU had no patients and it was doubtful there would be any new patients in the immediate future.

On March 27, 1987, the Fair Hearing Committee met for over seventeen hours to hear testimony from Rea and Johnson.  Following the hearing, the committee voted to reinstate Rea and Johnson's privileges, although at least one member of the committee thought that the narcotic use in the ECU was "excessive."  Based on the committee's report, the MEC reinstated Rea and Johnson's privileges, but placed them on probation for twelve months, on the condition that the charts of their patients would be reviewed periodically.

Rea and Johnson appealed the probation decision to the Hospital's Board of Trustees, the final authority on admitting privileges.  The Board of Trustees voted to reinstate the doctors without placing them on probation.  The Board of Trustees, however, sent Rea and Johnson a letter of concern regarding the

"questionable use of narcotics" in the ECU.  The Hospital restored Rea and Johnson's privileges on June 11, 1987, which was of little practical consequence to them, however, because the ECU had been closed.

On September 17, Health Services sold the Hospital to Bedford-Northeast Community Hospital, Inc. ("BNECH").  Martin continued to act as Hospital Administrator after the sale to BNECH.  Although Martin discussed with Rea and Johnson the reopening of the ECU on several occasions, on December 15, 1987, the Hospital made a final decision not to reopen it.

On February 14, 1989, Rea and Johnson filed this suit,  naming initially as defendants the Hospital Corporation of America ("HCA") (which was later dismissed by order of the district court), the Hospital, Martin, Linton, Feingold, Firstenberg, and Haberer.  They asserted violations of the Sherman Act, breach of contract, fraud, negligent misrepresentation, slander, business disparagement, and tortious interference with business relations.  On February 15, 1990, Rea and Johnson joined as plaintiffs their professional associations, William J. Rea, M.D. and Associates ("PA1") and Environmental Health Center-Dallas, Inc., f/k/a/ WJR & Associates, P.A. ("PA2").  At the same time they added the Hospital's parent corporation, Health Services, as a defendant.

Following a bench trial, the district court held for defendants on the claims for antitrust, breach of contract, fraud, negligent misrepresentation, slander, and business disparagement.

With respect to the claim for tortious interference with business relations, the district court concluded that two defendants, Firstenberg and Feingold, were entitled to civil immunity under Texas's peer review statute, and consequently denied the plaintiffs' claim against them. As to the remaining defendants, the district court concluded that the Hospital, Health Services, Martin, Linton and Haberer engaged in two separate incidents of tortious interference with Rea and Johnson's contractual relations with their patients--first, by closing the Hospital's ECU and, second, by summarily suspending Rea and Johnson's admitting privileges. The district court awarded Rea and Johnson compensatory damages from February 16, 1987, the date of their summary suspensions, to December 15, 1987, the date on which the Hospital decided not to reopen the ECU. Based on expert testimony that the damages from lost patient revenue equaled $653.23 per day, the district court awarded Rea and Johnson $197,928.00[4] in compensatory damages. The court also awarded Rea and Johnson exemplary damages in the amount of $200,000.00. Each side has appealed the district court's judgment.

II

---

[4]The district court found the Hospital, Health Services and Martin jointly and severally liable to Drs. Rea and Johnson for $122,154.00. In addition, the court found the Hospital, Health Services, Martin, Haberer, and Linton jointly and severally liable for an additional sum of $75,774.00.

Our task is to determine whether and to what extent Rea and Johnson have proved that they are entitled to damages under the business disparagement, antitrust or tortious interference claims asserted by them at trial and on appeal. We begin with the defendants' claim that Rea and Johnson have failed to prove standing to recover damages stemming from their summary suspension and the Hospital's closure of the ECU. We then examine each of the theories advanced by Rea and Johnson on appeal as a basis for their recovery of damages.[5]

III

As a preliminary matter, the defendants contend that Rea and Johnson lack standing to seek damages stemming from their summary suspension and the Hospital's closure of the ECU. The defendants argue that the only damages proved were damages to Rea and Johnson's professional association, PA2; PA2, moreover, is barred from recovering any damages for tortious interference because the limitations period has run, and because PA2 had no admitting privileges. We are unconvinced by either argument.

The defendants correctly observe that the damages for tortious interference proved at trial were damages to PA2. The plaintiffs' expert on damages testified that the loss suffered in this case included lost profits from the sale of services and products provided to ECU patients. Because the fees for these services are

_____

[5]Rea and Johnson do not appeal the dismissal of their breach of contract, fraud, and negligent misrepresentation claims.

-11-

paid to PA2, and not to Rea and Johnson directly, the calculation of damages derived entirely from the loss of earnings to PA2. The defendants are also correct that under Texas law a shareholder does not have an individual cause of action for personal damages caused solely by a wrong done to the corporation. See Cullum v. General Motors Acceptance Corp., 115 S.W.2d 1196, 1201 (Tex.Civ.App.-- Amarillo 1938, no writ).

We cannot agree, however, that Rea and Johnson lack standing to recover the damages proved at trial. PA2 assigned its rights to Rea and Johnson, who may then recover to the same extent as PA2. See State Fidelity Mortg. Co. v. Varner, 740 S.W.2d 477, 480 (Tex.App.--Houston 1987). Contrary to the defendants' assertion, PA2 was not barred from recovering damages by limitations. Rea and Johnson filed their tortious interference claim within the applicable two-year limitations period; their joinder of PA2 after the limitations period relates back to the initial filing of the suit. See Fed. R. Civ. P. 17(a); Ratner v. Sioux National Gas Corp., 770 F.2d 512, 515, 520 (5th Cir. 1985).

We conclude, moreover, that PA2 has standing to sue for recovery of damages stemming from the denial of Rea and Johnson's admitting privileges. In order to establish individual standing, a plaintiff must show that: (1) he has suffered an actual or threatened injury as a result of the actions of the defendant; (2) the injury is "fairly traceable" to the defendant's actions; and (3) the injury will likely be redressed if he prevails in his

lawsuit. Save Our Community v. U.S.E.P.A., 971 F.2d 1155, 1160 (5th Cir. 1992) (quoting Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758-59 (1982)).

PA2 possesses this Article III requirement for standing. Because Rea and Johnson generate all of the revenues of PA2, they are the primary assets of that association. As a result, PA2 is injured in fact by the Hospital's summary suspensions of Rea and Johnson and we may relieve that injury by awarding damages to PA2.[6] As assignees of PA2, Rea and Johnson may recover to the same extent as PA2.

Having established that Rea and Johnson have standing to recover the losses sustained by their professional association, we now consider whether and to what extent they have proved that they are entitled to damages under any theory asserted by them on appeal. We first consider whether the plaintiffs' business

---

[6]We note that the Eleventh Circuit Court of Appeals has held that a corporation of which a suspended physician is the sole shareholder has no standing to sue for damages stemming from the denial of the physician's admitting privileges. See Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1441 n.1 (11th Cir. 1991). In Todorov, the Eleventh Circuit reasoned that "[i]t is [the physician], not [his] corporation, who [is] seeking privileges at [the Hospital] and, thus, the relief prayed for in this case." Id.

Unlike the plaintiff in Todorov, Rea and Johnson do not seek injunctive relief since the Hospital has reinstated their admitting privileges. Even if, however, Rea and Johnson sought injunctive relief, PA2 would have constitutional standing to seek damages as it was injured by the Hospital's summary suspension of its primary assets, Rea and Johnson.

disparagement claim, denied by the trial court, will support an award of damages to Rea and Johnson.

IV

Rea and Johnson cross-appeal the district court's denial of their claims for business disparagement, arguing that they properly established special damages.  The district court found that Rea and Johnson failed to "show loss of patients or earnings that resulted directly from the alleged false communications made by Defendants."  Relying on comment c. to § 632 of the Restatement (2d) of Torts, Rea and Johnson argue that the actual disparagement need not be the sole, exclusive factor causing the plaintiffs' damages; instead, they assert, the disparagement need only be "a substantial factor in bringing about the loss."

We cannot agree.  The elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege and special damages. Hurlbut v. Gulf Atlantic Life Ins., 749 S.W.2d 762, 767 (Tex. 1987).  To prove special damages, a plaintiff must provide evidence of direct, pecuniary loss attributable to the false communications of the defendants.  Id. (rejecting a claim for business disparagement where "[o]ur review of the record reveals no evidence of the direct, pecuniary loss necessary to satisfy the special damages of a claim for business disparagement).  Rea and Johnson provided no evidence of direct loss at trial, and can point to no

-14-

such loss on appeal.  We therefore conclude that Rea and Johnson are entitled to no damages for business disparagement.

We next consider whether the plaintiffs' antitrust claim, denied by the trial court, can support an award of damages to Rea and Johnson. Although Rea and Johnson fail to articulate a coherent theory to support their antitrust claim, they allege that the Hospital, Health Services, Linton, Martin, Haberer, Firstenberg and Feingold violated section 1 of the Sherman Act by conspiring to exclude them from practicing medicine at the Hospital.[7] According to Rea and Johnson, the purpose of their summary suspensions and the Hospital's closure of its ECU was "to deny all environmental medicine physicians as a class the ability to compete at the Hospital," with the effect that the medical practices of the individual defendants would benefit.

The district court denied Rea and Johnson's antitrust claim after concluding that they failed to demonstrate a conspiracy either to close the ECU or to summarily suspend their admitting privileges. The ECU's closure, the district court found, was a unilateral decision by the Hospital, acting through Martin, and therefore could not form the basis of a conspiracy. With respect to the alleged conspiracy to summarily suspend Rea and Johnson's admitting privileges, the district court found that any

---

[7]Rea and Johnson also sued under state antitrust law. See Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05(a). Because the Texas Act mandates that its provisions be interpreted in harmony with federal antitrust law, id. at § 15.04(a), we do not separately analyze the plaintiffs' state law antitrust claims.

"conspiracy . . . among the defendants . . . was not economically motivated."  Although the district court recognized that Rea and Johnson's theory--that "once [Rea and Johnson] could no longer treat their patients . . . then these patients could be treated by other doctors, including the defendants"--"may be true in the abstract," the court found that "there is no evidence that any of the individual Defendants stood to benefit economically from the suspensions of the closing of the ECU."  This was, the court noted, because many of Rea and Johnson's patients were from Canada and no patient of the plaintiffs "had ever been treated by, were referred by, or were ever treated afterward by any of the defendant doctors."[8]

When a district court sits as a finder of fact, its factual determinations will not be overturned on appeal unless they are clearly erroneous.  Pacific Employers Ins. Co. v. M/V Gloria, 767 F.2d 229, 241 (5th Cir. 1985), reh'g denied, 782 F.2d 1351 (5th Cir. 1986).  Under the clearly erroneous standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985).

---

[8]In addition to finding no antitrust conspiracy, the court also found that Rea and Johnson failed to prove that the alleged conspiracy unreasonably restrained trade.

We consider first whether the district court erred in concluding that no antitrust conspiracy existed to close the ECU and then address whether the court erred in finding no such conspiracy with respect to the plaintiffs' summary suspension.

A

Section 1 of the Sherman Antitrust Act forbids contracts, combinations, or conspiracies in restraint of trade or commerce. 15 U.S.C. § 1. To prevail on a section one claim, plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market. See Kiepfer v. Beller, 944 F.2D 1213, 1221 (5th Cir.1991). Section one applies only to concerted action; unilateral conduct is excluded from its purview. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). The plaintiffs bear the burden of proving each element of the section one violation. See, e.g., Jefferson Parish Hosp. Dist. No. 2, v. Hyde, 466 U.S. 2, 29, 104 S.Ct. 1551, 1567 (1984).

The initial--and determinative--question in this appeal is whether Rea and Johnson have established proof of a conspiracy either to close the ECU or to summarily suspend their admitting privileges. A plaintiff may rely on either direct or circumstantial evidence. American Tobacco Co. v. United States, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1139 (1946). When, as here, plaintiffs rely on circumstantial evidence to prove the existence of a conspiracy, they must proffer sufficient evidence to permit

the inference of an antitrust conspiracy.  The Supreme Court in

Matsushita Elec. Indust. Co. v. Zenith Radio Corp. established the

governing standard for what constitutes sufficient evidence to

permit the inference of an antitrust conspiracy:

> [T]here must be evidence that tends to exclude the possibility of independent action. . . .  [I]n other words, [a plaintiff] must show that the inference of conspiracy is reasonable in light of the competing interferences of independent action or collusive action that could not have harmed [the plaintiff]."

475 U.S. 574, 588, 106 S.Ct. 1348, 1356 (1986) (citations omitted)

(emphasis added).

In the present suit, we cannot say that the district court

clearly erred by finding that Rea and Johnson failed to establish

a conspiracy to close the ECU.  The district court concluded that

the closure of the ECU was a unilateral decision of the Hospital.

The undisputed evidence amply supports this conclusion.  Each of

the defendant doctors testified without contradiction that he had

no input into the decision to close the ECU, testimony that was

confirmed by Martin.  Recognizing that the evidence shows no

conspiracy between the Hospital and the defendant doctors, Rea and

Johnson insist on a conspiracy between the Hospital and the entity

that acquired it in September 1987, BNECH.[9]  Essentially, Rea and

---

[9]Six weeks after the Hospital closed the ECU, it was sold by its parent, Health Services, to a new entity, Bedford-Northeast Community Hospital, Inc. ("BNECH").  Thus, Rea and Johnson assert that prior to its closing, the Hospital and its soon-to-be parent, BNECH, conspired to close the ECU.  In addition, they maintain that after the ECU's closing, the Hospital and its previous parent, Health Services, conspired not to reopen the ECU.

Johnson argue that the closure of the ECU consists of two subsidiary decisions--the decision by the Hospital to close the ECU and the decision of BNECH not to reopen the ECU--and that the Hospital conspired with BNECH in making these decisions. We reject out-of-hand the existence of a conspiracy initially to close the ECU. BNECH was not incorporated until nearly six weeks after the ECU's closure; because it did not exist at the time, it simply could not have conspired with the Hospital to close the ECU.

We find no greater factual basis for Rea and Johnson's assertion of a later conspiracy not to reopen the ECU. Rea and Johnson provide no evidence that the Hospital's first parent, Health Services, took any action with respect to the ECU after September 17, the date of the sale to BNECH. Absent such evidence, Rea and Johnson can point to little more than the mere opportunity to conspire. In sum, the district court was not clearly erroneous in choosing to credit Martin's testimony that he decided unilaterally to close the ECU and, later, not to reopen the ECU and therefore in refusing to find an antitrust conspiracy surrounding the ECU's closure.                    B

Neither can we say that the district court erred by finding that Rea and Johnson failed to establish a conspiracy to summarily suspend their admitting privileges. As we noted earlier, to make such a showing, Rea and Johnson were required to provide "evidence that tends to exclude the possibility of . . . <u>collusive action that could not have harmed [the plaintiff]</u>." <u>Matsushita Elec.</u>

Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356 (1986) (citations omitted) (emphasis added). Furthermore, the Supreme Court has explicitly cautioned that "if the claim is one that simply makes no economic sense[,] respondents must come forward with more persuasive evidence to support their claim than otherwise would be necessary." Id. at 1361. Thus, if the plaintiffs "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Id.

Here, the district court concluded that Rea and Johnson provided no evidence that "any of the individual Defendants stood to benefit economically from the suspensions of the closing of the ECU," and thus that they had proved no antitrust conspiracy. As before, we cannot say that the district court committed error by finding that Rea and Johnson failed to establish an illegal conspiracy. There is no evidence that any individual defendant was in competition with Rea and Johnson at the time of the summary suspensions and the closure of the ECU. The district court's conclusions are supported by the testimony of Drs. Haberer, Firstenberg, Feingold and Linton, all of whom testified that they did not hold themselves out as being capable of treating environmental illnesses. Indeed, Drs. Haberer, Firstenberg, and Linton did not even have ECU privileges at the time of the suspensions.

The evidence supporting an antitrust conspiracy is even clearer relative to the Hospital and Health Services. The evidence showed that patient admissions generate revenues for the Hospital as well as the admitting doctor. Consequently, there is no economic benefit that would inure to the Hospital and its parent from suspending the plaintiffs. Indeed, "as presumably rational businesses, [they] had every incentive not to engage in the conduct with which they are charged." Id. at 1360.

In sum, we see no error in the district court's determination that no antitrust conspiracy existed. We conclude therefore that Rea and Johnson's antitrust claim can support no award of damages to them.

V

Finally, we consider whether the claim of tortious interference with business relations may support the district court's award of damages to Rea and Johnson. The plaintiffs asserted two claims based on tortious interference--first, the Hospital's closure of the ECU and, second, its summary suspension of Rea and Johnson. We examine first whether tortious interference stemming from the closing of the ECU may support an award of damages. We then consider whether tortious interference arising from the summary suspensions can support an award of damages.

A

The district court held that the defendants, Martin and the Hospital, tortiously interfered with the plaintiffs' contractual

relationships with their patients when they closed the ECU on March 26, 1987, notwithstanding the Hospital's proprietary right to close one of its units.  Relying on Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931 (Tex. 1991), the district court concluded that under Texas law only a good faith assertion of legal rights may be raised as a defense against a claim of interference with contractual relations; the court then found that although the Hospital had a proprietary right to close the ECU, Martin and the Hospital did not act in good faith.  Attacking the district court's judgment, the defendants argue that good faith is not required under Texas law when a party has a superior interest in the subject matter.  Because they had the lawful right to close the ECU, the defendants contend, their decision to close the unit cannot be the basis of a claim for tortious interference with business relations.

To recover for tortious interference with an existing contract, the plaintiff must prove:  (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage and (4) actual damage or loss occurred. Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex. 1991).  Nevertheless, "[e]ven if a plaintiff establishes the elements of this cause of action, a defendant may still prevail upon establishing the affirmative defense of justification." Texas Beef Cattle Co. v. Green, ___ S.W.2d ___, 1996 WL 11237 (Tex. 1996).

After this case was tried, the Texas Supreme Court clarified the relationship of good faith to a defendant's affirmative defense of justification based on a legal right. See Texas Beef Cattle Co. v. Green, ___ S.W.2d ___, 1996 WL 11237 (Tex. 1996). The Court held categorically that "if the trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense and the motivation behind assertion of that right is irrelevant." Id. at * 7. Although Victoria Bank stated that "the defense of legal justification protects only good faith assertions of legal rights," the Court in Texas Beef expressly

> disavow[ed] good faith as relevant to the justification defense when the defendant establishes its legal right to act as it did. Only when mistaken, but colorable claims of legal rights are asserted is the good faith of the actor legally significant. Only then must the jury determine whether the defendant believed in good faith that it had a colorable legal right.

Id.

Thus, Texas Beef is dispositive of the plaintiffs' claim for damages based on the defendants' closure of its ECU. There is no agreement between the Hospital and the plaintiffs requiring the Hospital to keep its ECU open. As such, the Hospital has established conclusively its legal right to close its ECU. In the newly shed light of Texas Beef, the Hospital's motivation in closing its ECU is irrelevant to its defense of justification. We therefore conclude that Rea and Johnson's claim for tortious interference stemming from the Hospital's closure of its ECU can

support no part of the damage award.  Consequently, we reverse and vacate the judgment of the district court, and render judgment for the defendants on the claim that the Hospital's closure of its ECU tortiously interfered with the plaintiffs' business contracts.  We now turn to the plaintiffs' second claim for damages based on the defendants interfering with its business contracts.

B

As we have noted earlier, the district court also held that the plaintiffs had proved additional damages based on a second incident of contract interference--the Hospital's summary suspension of Rea and Johnson's admitting privileges.  The district court concluded, however, that two of the defendants, Firstenberg and Feingold, acted without malice and therefore were entitled to immunity.  The remaining defendants--Linton, Martin, Haberer and the Hospital--were not entitled to immunity from civil liability, the court held, because "the suspension of the Plaintiffs was not done without malice <u>and</u> in the reasonable belief that their actions were not warranted by the facts known to them."  These defendants contend that the district court applied the wrong standard for malice.  The district court must be reversed, they argue, because its finding of malice is clearly erroneous when the correct standard is applied.  Rea and Johnson cross-appeal, arguing that they presented overwhelming evidence of malice and bad faith on the part of Feingold and Firstenberg, as well as all other defendants.

The defendants' qualification for civil immunity in relation to the suspensions of Rea and Johnson is governed by Texas' peer review statute. In 1987--when the alleged tort occurred--that statute provided in pertinent part that:

> (f) The following persons are immune from civil liability:
> (1) a person reporting to or furnishing information to a medical peer review committee;
> (2) . . . a member, employee, or agent of a medical peer review committee . . . who takes any action or makes any recommendation within the scope of the functions of the . . . committee . . . if such member, employee, or agent <u>acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him</u> . . .

Tex. Rev. Civ. Stat. art. 4495b, § 5.06(f) (Vernon Supp. 1985) (emphasis added).

At the time of the district court's decision, "malice" had not been defined by any Texas court for the purpose of art. 4495b, § 5.06(f). Subsequently, however, Texas courts adopted the "actual malice" standard: "Malice as used in Article 4495(b) . . . [means] knowledge that an allegation is false or with reckless disregard for whether the allegation is false." <u>Maewal v. Adventist Health Systems/Sunbelt, Inc.</u>, 868 S.W.2d 889, 893 (Tex. Ct. App. 1993).

We agree with the defendants that the district court, lacking a definitive statement from any Texas court, applied the wrong standard for malice. The standard for common law malice requires "spite, ill will, evil motive or purposeful injury of another." <u>Id.</u> at 892. The district court quite clearly based its denial of

immunity on its conclusion that the Hospital, Martin, Linton and Haberer acted out of spite toward Rea and Johnson.  The court observed that the suspensions were motivated by "past antagonism and conflict" between the plaintiffs and Haberer and Martin, "the perceived arrogance of the Plaintiffs, and, to some extent, disagreements over the legitimacy of the practice of environmental medicine."  The court further found that Linton and Martin suspended the plaintiffs without either one of them reviewing a single chart; instead, they "took this drastic action on the basis of what they heard from Haberer, who had prior conflicts with Plaintiffs."  The court specifically concluded that this conduct "showed malice on the part of [Martin, Linton and Haberer], and that the acts were <u>intentional and willful</u>."[10]

This court has on many occasions held that the "clearly erroneous" standard of review does not insulate factual findings premised upon an erroneous view of controlling legal principles. <u>Johnson v. Uncle Ben's, Inc.</u>, 628 F.2d 419, 422 (5th Cir. 1980). In the light of the district court's erroneous application of the common law standard for malice, we vacate the judgment based on this claim and remand to the district court for further consideration and analysis, in accordance with <u>Maewal v. Adventist Health Systems/Sunbelt, Inc.</u>, of whether any defendant acted with

_____

[10]With much less explanation, the district court granted immunity to Firstenberg and Feingold.  The court simply found that the latter "did not act with malice and are, therefore, entitled to" civil immunity.

the knowledge that the allegations against Rea and Johnson leading to their suspensions were false or with reckless disregard for the falsity of those allegations.

If the district court finds on remand that one or more defendants acted with knowledge of or reckless disregard for the falsity of those allegations, and therefore is not entitled to civil immunity, it must then recalculate its award of compensatory damages to Rea and Johnson. The court premised its award of damages not only on the summary suspension of admitting privileges, but also on the Hospital's closure of the ECU, for which the Hospital established the affirmative defense of justification. As we concluded earlier, the Hospital's closure of the ECU, in accord with its legal right to do so, can support no part of the damage award. Consequently, Rea and Johnson may not recover for lost patient revenue after the ECU's closure on March 26, 1987.[11] If the

_____

[11]Because Rea and Johnson admitted patients at the Hospital only to the ECU, and because, as we have held, supra, the Hospital had the proprietary right to close the ECU, they would have generated no patient revenue from hospital admission after this date even if their admitting privileges had not been suspended. They therefore can demonstrate no damages after this date stemming from the suspension of their admitting privileges.

Arguing that the Hospital's closure of the ECU is "mere subterfuge or retaliation," Rea and Johnson urge that the defendants "should not be permitted to dichotomize their accountability" for the damages to Rea and Johnson stemming from their suspension. In effect, they argue that they are entitled to damages even after March 26, even though neither they nor any other doctor could admit patients to the ECU. We cannot agree. Were we to accept this, the Hospital would be required to pay damages to Rea and Johnson notwithstanding its superior legal right to close the ECU. Because the revenue Rea and Johnson generated from admitting patients to the ECU would have ceased with the ECU's

district court decides to award damages to the plaintiffs, and in the light of the fact that the compensatory damage award, if any, to Rea and Johnson on remand will be considerably reduced upon recalculation, the district court also must reconsider and, if appropriate, recalculate its award of exemplary damages.

VI

Accordingly, we AFFIRM the district court's denial of the plaintiffs' claims for business disparagement and violations of section one of the Sherman Act, REVERSE AND VACATE the district court's award of damages to the plaintiffs for tortious interference with business relations arising from the Hospital's closure of the ECU, and VACATE the judgment based on the plaintiff's claim for tortious interference with business relations stemming from their summary suspensions and REMAND for additional findings of fact and recalculation of damages in a manner not inconsistent with this opinion.

AFFIRMED in part, REVERSED in part,<br>VACATED in part and REMANDED.

---

closure even if they had not been suspended, any damages to them resulting from the closure have no causal connection to the denial of their patient privileges, and thus the damage award they ask for would give Rea and Johnson a windfall.