**STEWART GLASS & MIRROR, INC., et al., Plaintiffs,**

v.

**U.S.A. GLAS, INC., et al., Defendants.**

**No. 1:95–CV–813.**

United States District Court, E.D. Texas, Beaumont Division.

Aug. 14, 1998.

Dennis M. Dylewski, Dylewski & Douglass, Houston, TX, for Stewart Glass & Mirror Inc., Texas Mobil Auto Glass Inc., RLJ Inc., Freddy's Auto Glass & Mirror Inc., Nederland Glass Co., Inc., Lone Star Glass Inc., Auto Glass Specialists Inc., Alamo Glass of Port Arthur, Inc. and Ray Glass Co., Inc.

J. Michael Baldwin, David Gregory Patent, Baker & Botts, Houston, TX, Robert K. Niewijk, Joel G. Chefitz, Katten Muchin & Zavis, Chicago, IL, for U.S. Auto Glass Discount Centers, Inc.

David W. Ledyard, Strong Pipkin Nelson & Bissell, Beaumont, TX, Paul Sanders Francis, Baker & Hostetler, Houston, TX, Robert M. Kincaid, Jr., Baker & Hostetler, Columbus, OH, Julie E. Hawkins, Lee H. Simowitz, Gerald A. Connell, Baker & Hostetler, Washington, DC, for Safelite Glass Corp.

Christopher K. Larus, John A. Cotter, Larkin Hoffman Daly & Lindgren Ltd., Bloomington, MN, Walter Joshua Crawford, Jr., Crawford & Olesen LLP, Beaumont, TX, for Harmon Glass Co., Inc.

Thomas A. Doyle, Donald J. Hayden, Baker & McKenzie, Chicago, IL, David J. Beck, L. Nicole Batey, Beck Redden & Secrest LLP, for Windshields American, Inc.

J. Michael Baldwin, David Gregory Patent, Baker & Botts, Houston, TX, Robert K. Niewijk, Joel G. Chefitz, Todd L. McLawhorn, Katten Muchin & Zavis, Chicago, IL, for U.S.A. Glas, Inc.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SCHELL, Chief Judge.

This matter is before the court on Defendants' Motion for Summary Judgment filed on February 3, 1998. Plaintiffs filed a response on March 3, 1998. Defendants filed a reply to Plaintiffs' response on April 8, 1998, and Plaintiffs filed a sur-reply on April 9, 1998. The court heard oral argument on August 6, 1998. Upon consideration of the written submissions of the parties, oral argument, and the applicable law, the court is of the opinion that Defendants' Motion for Summary Judgment should be GRANTED.

### I. BACKGROUND

Plaintiffs are eight Texas corporations engaged in the business of repair and replacement of auto glass and residential and commercial flat glass. At the time Plaintiffs filed this action, Defendants were four foreign corporations doing business in Texas. Defendants Windshields America and U.S.A. GLAS subsequently merged to form a single company, Vistar Inc. Vistar Inc. then merged into Safelite Glas Corporation on December 18, 1997. Therefore, the four companies have now become two: Vistar Inc. and Harmon Glass Company.

Defendants and Plaintiffs are competitors in the auto glass repair and replacement business. Each Defendant's glass repair business is comprised of two parts: (1) individual company-owned glass shops and (2) a glass repair network. Defs.' Mot. for Summ. J. at 2. The operation of the Defendants' networks is, on its face, quite simple. The network company enters into either a regional or national agreement with an insurer to provide a claims management network to provide repair services to the insurer's policyholders. *Id.* at 3. Although such a network is usually considered the insurance company's network, it is maintained and operated by the network company. The network company maintains a customer service call center network to receive claims calls from the insurer's policyholders. *Id.* When a policyholder calls his insurer with a claim, the insurer will transfer the policyholder to a network call center where he will be greeted by a customer service representative ("CSR"). The CSR will then obtain certain information from the policyholder such as his coverage and deductible amount. The CSR is required to follow a company-created and insurer-approved script when taking this information. The CSR will then "provide the policyholder with the names, phone numbers, and addresses of network affiliates near the policyholder who stand contractually committed to perform the glass work he needs." *Id.*

These network affiliates are individual glass shops. These individual shops include the network company's own glass shops, other Defendants' glass shops, and certain independent glass shops. *Id.* The network company enters into non-exclusive contracts with each of these individual network affiliates. Pursuant to these subcontracts, the network affiliates agree to specific prices at which they will perform repair services for policyholders referred to them by the network's CSR.

After giving the policyholder information regarding network affiliates who can perform his glass work, the CSR will then ask the policyholder if he has a particular shop which he would like to use. *Id.* at 4. If he has such a preference, the policyholder can use that shop; however, the CSR will encourage him to choose a network affiliate to do the work. *Id.* Once the network affiliate completes the work, the policyholder pays the affiliate an amount equal to his insurance

policy deductible. *Id.* The network company then pays the remainder of the policyholder's bill directly to the network affiliate. Finally, the network company bills the insurer according to the terms of the contract between the network company and the insurer.

Under the network system, the price paid by the insurer often exceeds the price charged by the network affiliate. *Id.* This mark-up in price includes the actual repair or replacement work, as well as the costs of running the network call center and claim management services. *Id.* If the contract price paid by the insurer exceeds the aggregate prices charged by the network affiliate and the costs of operating the network, the network company enjoys a profit; if not, the network company suffers a loss. *Id.*

Plaintiffs sued Defendants, alleging that their conduct in forming and operating glass repair network systems such as that described above violates Sections 1 and 2 of the Sherman Act, as well as Texas law. On September 16, 1996, the court signed an order granting in part and denying in part Defendants' motions to dismiss. *See Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.,* 940 F.Supp. 1026 (E.D.Tex.1996). In light of that order, the following claims remain:

1. Section 1 claim for unreasonably restraining trade;

2. Section 1 claim for unlawfully boycotting Plaintiffs by denying them referrals from insurance companies;

3. Section 2 claim for monopolizing, attempting to monopolize, and conspiring to monopolize the auto glass repair market through willfully acquired monopoly power; and,

4. Claims under Texas common law for tortiously interfering with Plaintiffs' existing and prospective contracts.

*Id.* Defendants now move for summary judgment on each of these claims.

## II. ANALYSIS

### A. *Summary Judgment Standard in Antitrust Cases*

Antitrust claims are subject to the same summary judgment standards as other claims. However, summary judgment is not common in antitrust cases. *Consol. Metal Prod. v. American Petroleum Inst.,* 846 F.2d 284, 288 (5th Cir.1988). The disfavor given summary judgment in antitrust cases is not because of the application of a different set of rules but, rather, "because the relevant factual disputes in antitrust cases are typically more complicated tha[n] those in other cases. Accordingly, it is typically more difficult for the trial court to resolve all doubt about the merits of an antitrust claim on the . . . pre-trial record alone." *Id.* Nevertheless, when defending an antitrust claim against summary judgment, an antitrust plaintiff must clear "the same hurdle as the plaintiff in any other cause of action: it must come forward with specific facts showing that there is a *genuine issue for trial.*" *Id.* at 289 (internal quotations omitted).

### B. *Section 1 of the Sherman Act*

"Section 1 of the Sherman Antitrust Act forbids contracts, combinations, or conspiracies in restraint of trade or commerce." *Johnson v. Hosp. Corp. of America,* 95 F.3d 383, 392 (5th Cir.1996). The elements of a Section 1 claim are that the defendant (1) engaged in a conspiracy (2) affecting interstate commerce (3) that had an anti-competitive effect in the relevant market. *Id.* In addition to proving the existence of an antitrust conspiracy, the plaintiff must also prove that it has suffered a cognizable antitrust injury. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348. A plaintiff must show concerted action. Consequently, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* When a plaintiff relies "on circumstantial evidence to prove the existence of a conspiracy, [it] must proffer sufficient evidence to permit the inference of an antitrust conspiracy." *Johnson v. Hosp. Corp. of America,* 95 F.3d 383, 392 (5th Cir.1996). The plaintiff must present evi-

dence that tends to exclude the possibility that the alleged conspirators acted independently. *See Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). When there is no economically plausible motive for the alleged conspiracy, the scope of permissible conclusions which may be drawn from ambiguous evidence is limited. *Matsushita,* 475 U.S. at 596, 106 S.Ct. 1348. In other words, if a defendant "had no rational economic motive to conspire, and if [its] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596–97, 106 S.Ct. 1348. Whether the plaintiff alleges a horizontal conspiracy among competitors, or a vertical conspiracy between a manufacturer/seller and a distributor/buyer, the focus remains the same: is there sufficient evidence to create a reasonable inference of concerted action to engage in illegal conduct?

Defendants argue that Plaintiffs do not have the specific type of evidence required to support their conspiracy claim under the above standard. Defendants claim that in order to establish a viable claim, Plaintiffs must come forward with specific evidence to establish the existence of a conspiracy. Defendants contend that Plaintiffs can make only a "mere showing of parallel action, of an opportunity to conspire, or of relationships between the alleged conspirators [which] is insufficient to survive summary judgment." Defs.' Mot. for Summ. J. at 20. Defendants contend that Plaintiffs must exclude the possibility of independent action. *Id.* at 21. Defendants also argue that Plaintiffs cannot show that Defendants had a plausible, economically rational motive to engage in the alleged conspiracy. *Id.* Further, Defendants allege that it was Plaintiffs, not Defendants, who refused to deal in this case.

Plaintiffs claim that a conspiracy can be proven by circumstantial or direct evidence. Plaintiffs contend that the alleged conspiracy in this case must be viewed as a whole. Plaintiffs claim that there are two intertwined types of conspiracies in this case. First, Plaintiffs complain of vertical agree-ments in restraint of trade between Defendants (sellers) and third-party insurance companies (buyers). Plaintiffs concede that these agreements are similar to vertical agreements which have been upheld in challenges to preferred provider agreements in the medical care industry. However, Plaintiffs argue that when viewed together with the second type of agreements complained of in this case, horizontal agreements in restraint of trade between each defendant company, these vertical agreements can be distinguished from preferred provider agreements.

The overriding theme of Plaintiffs' case is that the Defendants worked together to eliminate independent glass shops from the glass repair market. Plaintiffs offer several volumes of exhibits in support of their claim. Although the court has carefully reviewed each of these exhibits, it would be virtually impossible for the court to discuss each of Plaintiffs' exhibits in this opinion. For the purposes of this opinion, however, the court will discuss the numerous exhibits relied upon by Plaintiffs during oral argument, which are, according to Plaintiffs, most helpful to their case.

Plaintiffs claim that their summary judgment evidence creates an issue of fact as to whether Defendants conspired to form illegal network systems. Plaintiffs point to an internal Safelite memorandum where an executive stated: "If we (including the other majors) take share from independents to a point where we 'control' service, why can't we achieve price improvement?"[1] Pls.' Proper Summ. J. Evidence, Vol. 1, Ex. 66. Plaintiffs claim this memorandum demonstrates Defendants' desire to ensure that the major glass companies gained control of the industry. Plaintiffs also rely upon Exhibit 200. This exhibit is a 1995 Harmon memorandum listing several company concerns, one of which was: "How long will we [Harmon] share network accounts with independent glass shops[?]". *Id.,* Ex. 200. Exhibit 25 shows that Defendants stressed a switch in philosophy from "competition to cooperation," in dealing with recent changes in the auto glass

---

1. There is a handwritten note, "AMEN!", in the margin of this memo. Defendants have stipu-lated that this note is written in the handwriting of Doug Herron, Safelite's CFO.

repair and replacement industry and even held a closed door "kick-off" meeting attended by an antitrust attorney, but did not invite independent glass shops. *Id.*, Ex. 25. Further, Plaintiffs claim that Exhibit 19 shows that Defendants were encouraged by the idea that their concerted effort would increase profits because each Defendant would get "a set percentage of a bigger pie." *Id.*, Ex. 19.

Plaintiffs also allege that in order to increase this pie, each Defendant's network system was made up not only of that Defendant's glass shops, but also the other Defendants' shops. Former competitors allegedly became part of a unified team. Plaintiffs allege the Defendants conspired to "use the network system to channel work to each other by various deals giving each other preference of referrals." *Id.*, Ex. 31–32. Defendants allegedly used means such as referral fees, rebates, and wholesale discounts in exchange for such referrals. *Id.*, Ex. 16, 27, 31–32, 35, 47, 75. Plaintiffs claim they were excluded from these "side deals." Plaintiffs also allege that Defendants made efforts to keep information concerning these agreements confidential, and cautioned each other to hire attorneys to ensure that they were "protected." *Id.*, Ex. 23.

Plaintiffs also claim that even though they were allowed to join the networks, Defendants nevertheless continued to try to keep business away from Plaintiffs. Plaintiffs claim Defendants created onerous conditions for membership including low prices, a small amount of referrals, and sharing and alleged misuse of trade secrets. *Id.*, Ex. 167–75, 179. Defendants allegedly utilized a variety of methods to steer policyholders away from using independent shops even if a policyholder requested a specific shop. When independents joined LYNX, a network comprised of independent glass shops, Defendants allegedly attempted to convince insurers not to use LYNX, and "ghost wrote" a letter for an insurance executive who was trying to convince the insurers not to use LYNX. *Id.*, Ex. 1, 12, 13, 115.

### C. Application of the Evidence

■ Despite Plaintiffs' arguments to the contrary, their evidence does not support their allegations of a conspiracy. Plaintiffs have not produced direct evidence of a conspiracy. Moreover, Plaintiffs' circumstantial evidence is not sufficient to eliminate the possibility that Defendants acted independently. Plaintiffs have not shown a single instance where a Defendant actually entered into an agreement with another Defendant to participate in illegal conduct. Plaintiffs' evidence does not show that Defendants' networks were the product of concerted action. Rather, this evidence merely shows that each Defendant's actions were directed toward winning business for themselves. Circumstantial evidence of conduct such as this, which is as consistent with a legal pro-competitive purpose as with an illegal purpose, is not sufficient to defeat summary judgment.

Indeed, Defendants' evidence demonstrates that each Defendant submitted separate bids to the insurance companies in order to obtain glass repair business on a national scale. *See, e.g.*, Defs.' Proper Summ. J. Evidence, Vol. 1, Ex. 21, pp. 163–64; Vol. 2, Ex. 12, pp. 99–101. This evidence shows that they did not cooperate with each other. Instead, the bidding process is highly competitive because the winning bidder can make greater profits. *Id.*, Vol. 2, Ex. 12, pp. 116–17. If a Defendant is a losing bidder, it is no different than an independent glass shop striving to get referrals from the winning bidder's network. Defendants have also produced evidence that the network systems have led to lower costs for insurance companies, which have led to better service and lower premiums for policyholders. *Id.* at pp. 101–103.

The uncontroverted evidence is that the network companies needed to include some independent glass shops as subcontractors in order for the network systems to satisfy insurers' demands for services on a national scale. In order for a defendant to operate a network system for an insurer, the network must have at least one available glass repair shop in its network for each geographical location within the network. If an insured requested needed repair work in a location where there were no available glass shops within a network system, then the network would have to find a non-network shop to do

the work. The network company would bear the risk that the shop would charge a price in excess of the price the insurer was contractually obligated to pay the network. Therefore, it was, and is, to Defendants' benefit to enter into subcontracts with as many glass shops as possible, including Plaintiffs, at as low a price as possible. It would be economically irrational for a Defendant to do otherwise.

The deposition of Glenn Decuir, a representative of one of the plaintiff independent glass shops, demonstrates that Defendants did not exclude Plaintiffs from participation in the network systems and that in many instances it was Plaintiffs who refused to participate. *Id.*, Vol. 1, Ex. 7, pp 121–123 (stating that he refused to take referral business from Defendants' CSR's by stating "I'm now against you, I don't want your business"). Further, Plaintiffs have not come forward with any specific evidence establishing that Defendants steered customers away from Plaintiffs' stores. To the contrary, both Plaintiffs' and Defendants' evidence shows that Defendants did not such thing. *See Id.* Vol III, Ex. L (Affidavit of Kim DiMaria) (stating that Harmon never gave preferential treatment to any glass shop, including Defendants', based on any factor other than service, quality, and price); Pls.' Proper Summ. J. Evidence, Vol. 1, Ex. 179 (Depo. of T. Cambree).

Plaintiffs claim that an inference of concerted action can be drawn from exhibits demonstrating that Defendants discussed alliances with each other and agreed upon such things as pricing and rebates. *See Id.,* Ex. 10, 23, 27, 28, 35, 46, 47, 75, 112, 119, 137. Defendants argue that the exhibits do not demonstrate any illegal agreements because they are not agreements between Defendants as networks. Rather, these are legal, vertical agreements between one Defendant as a network company and another Defendant as a network glass repair shop subcontractor.

Defendants rely on *Mosby v. American Medical Int'l, Inc.,* 656 F.Supp. 601 (S.D.Tex. 1987). In that case, Citizens General Hospital ("CGH") entered into an agreement with Dr. Vutpakdi, in which Vutpakdi agreed to provide continuous radiology services to CGH physicians. *Id.* at 604. Vutpakdi used an on-call roster of radiologists to help him meet his coverage obligations under this contract. The plaintiff, Mosby, was on this roster. Three months later, Vutpakdi stopped using the on-call roster, and began to use a full-time assistant to help him fulfill his obligations. *Id.* Vutpakdi's agreement was not an exclusive one. Therefore, although Mosby could no longer get referrals from Vutpakdi's on-call roster, he was still able to get referrals if an attending physician or patient requested his services. *Id.* Mosby filed suit, alleging that the agreement between CGH and Vutpakdi constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. *Id.*

The court found that although Mosby provided sufficient proof of a combination or agreement, he did not provide sufficient proof that this agreement *unreasonably* restrained trade. *Id.* at 606. Mosby provided nothing but bare allegations that CGH had tried to exclude him. The court recognized that "[c]ompetitive businesses maintain their share of the market by competing effectively. One method of [which] is to improve service to the customer. It is highly plausible that CGH sought to improve its radiology-service when it contracted with Dr. Vutpakdi." *Id.* Thus, the court did not find that CGH had an improper motive in entering into the agreement with Vutpakdi or allowing him to cease using the on-call list. *Id.* Further, the court found that competition and customer choice was not adversely affected. Mosby could still get business via patient and physician requests. *Id.* at 609. Patients could choose other hospitals, or they could choose a specific radiologist with staff privileges at CGH. *Id.* Thus, the court found that summary judgment in favor of CGH was proper because competition was not unreasonably restrained. *Id.*

Thus, the vertical agreements at issue in the present case are no different than *Mosby.* Just as any physician or patient could choose to use Mosby, a policyholder or insurance company can choose to use an independent glass shop. The policyholder has the right to choose a shop referred by the network's CSR or to choose a shop of his own.

And, just as CGH's decision to utilize the agreement with Vutpakdi was as consistent with an independent legal business purpose—improving price and customer service—as an illegal reason, the network systems here are also consistent with the legal business purpose of improving price and customer service.

Thus, these agreements are legal vertical agreements akin to those upheld in the medical care industry. An insurer (buyer) can contract with one or more networks (seller) in order to give their policyholders better pricing and service. An insurer could even choose to enter into an exclusive dealing agreement with a single network, and the network could enter into an exclusive subcontract with its own company glass shops to provide glass repair services.

Plaintiffs nevertheless argue that, unlike the agreements in *Mosby*, where the agreements at issue were strictly vertical ones, the vertical agreements in the present case are intertwined with numerous horizontal agreements between the network companies. Plaintiffs argue that Defendants entered into horizontal agreements to help facilitate the network systems and eliminate competition from independent glass shops. These horizontal agreements allegedly included agreements to channel business to each other, share trade secrets and market allocation, enter into reciprocal subcontracting agreements, and channel business away from Plaintiffs.

Contrary to Plaintiffs' arguments, they have not produced evidence that these vertical agreements were the product of illegal horizontal agreements between Defendants. The evidence in this case demonstrates that Defendants each individually realized that in order to survive in this highly competitive market, they needed to compete at two levels—first as a network and second as a network subcontractor. Each Defendant worked independently to form its own network system and to gain as much business as possible in that role. Then, each Defendant worked to enroll as many glass shops as possible in its network. If a Defendant did not win business at the network level, it would then strive to enroll in each Defen-

dants' network systems at the glass shop level, just as any independent shop would do.

It is only this second level of agreements to which Plaintiffs' evidence regarding agreements on price, rebates, and strategical alliances relates. Plaintiffs' exhibits pointing to agreements on pricing, strategical alliances, and rebates are simply common agreements between buyer and seller. A buyer has a right to purchase services from a seller at the most competitive rates possible. A buyer also has the right to provide the services itself instead of buying them from another source. Further, it is not illegal for a company to discuss, internally, strategies designed to keep as much work as possible within the company without having to refer the work out to its competitors.

Based on the above, the court finds that Plaintiffs have failed to come forward with evidence to create a fact issue on the conspiracy element of their Section 1 claim. Plaintiffs have not produced direct evidence of an agreement among Defendants at the network level. Further, Plaintiffs' circumstantial evidence neither negates the possibility that Defendants acted independently in creating and operating the network systems, nor creates an inference of concerted action by Defendants. The only evidence of agreements between Defendants relates to vertical agreements between buyer and seller. Such agreements are perfectly legal. Therefore, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' Section 1 claims.

### D.  *Section 2 of the Sherman Act*

■ Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. A plaintiff can bring three types of claims under Section 2: a claim for monopolization, a claim for attempted monopolization, and a claim for conspiracy to monopolize. The elements for each claim are as follows:

> To state a claim for *monopolization,* a plaintiff must allege: (i) a relevant product and geographic market; (ii) the possession of monopoly power in such a market; and (iii) *the willful acquisition or maintenance*

*of that power....* To state a claim for *attempted monopolization,* a plaintiff must allege: (i) a relevant product and geographic market; (ii) a specific intent to monopolize that market; (iii) exclusionary or predatory conduct in furtherance of the attempted monopolization; and (iv) a dangerous probability that, absent judicial intervention, the attempt will be successful.... To state a claim for *conspiracy to monopolize,* a plaintiff must allege: (i) the existence of a combination or conspiracy; (ii) an overt act in furtherance of the combination or conspiracy; (iii) substantial amount of interstate commerce affected; and (iv) specific intent to monopolize.

*Stewart Glass,* 940 F.Supp. at 1037 (citations and internal quotations omitted) (emphasis added). While the elements of each claim differ, each claim has the "common requirement that a defendant must have either monopoly power or the dangerous probability of acquiring it." *Id.*

As a threshold matter, Defendants argue that Plaintiffs' Section 2 conspiracy to monopolize claim must fail for the same reasons as Plaintiffs' Section 1 claims: lack of evidence of a conspiracy. Plaintiffs' Section 2 claims are based upon a theory of joint monopolization—the Defendants joined together to gain a dominant share of the market. Thus, to succeed under a theory of joint monopolization, Plaintiffs must establish that Defendants acted jointly.

Defendants argue that if there is not sufficient evidence of a conspiracy to support a Section 1 claim, then there is not sufficient evidence of a conspiracy to support a Section 2 claim. Defendants argue that the same standards of proof previously discussed apply when determining whether Plaintiffs have come forward with sufficient evidence to defeat summary judgment on a Section 2 claim. Defendants' argument is correct.

Plaintiffs' Section 2 claims allege that Defendants engaged in concerted action to gain a monopoly share. Plaintiffs have not produced sufficient evidence, however, to show that Defendants entered into an illegal agreement or engaged in a conspiracy of any kind. Therefore, Plaintiffs' Section 2 claims must fail. Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' Section 2 claims.

### E. State Law Claims for Tortious Interference with Actual and Prospective Contracts

■■■ "The elements for a cause of action for tortious interference with an existing contract are: (1) the existence of a contract subject to interference, (2) willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage has occurred." *Stewart Glass,* 940 F.Supp. at 1038. The elements of a cause of action for tortious interference with prospective contracts or business relationships are:

(1) A reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference.

*Id.* (citations and internal quotations omitted).

■■■ Defendants argue that Plaintiffs' tortious interference claims must fail because, even if they did interfere with Plaintiffs' contractual relationships, this interference is not unlawful if it resulted from mere spirited competition. That is, their conduct is only actionable if it was somehow wrongful. Plaintiffs concede this point and argue that proof of a violation of the antitrust laws is sufficient to support the wrongful conduct element in a tortious interference with existing or prospective contracts claim. In light of the court's ruling as to Plaintiffs' Section 1 and 2 claims, Plaintiffs cannot satisfy this burden. Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' claims for tortious interference with existing and prospective contracts.

### III. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED. It is so ORDERED.